St. Louis, Alton & Chicago Railroad Company v. Dalby.

---

THE ST. LOUIS, ALTON & CHICAGO RAILROAD COMPANY, Appellant, *v.* JOSEPH A. DALBY, Appellee.

APPEAL FROM LOGAN.

A railroad company must furnish proper facilities for procuring tickets, if it intends to charge extra fare, where tickets are not procured. And if a ticket is applied for and not furnished, that fact may be shown by the station agent, and his certificate of it should be evidence to the train conductor of the fact that the passenger was not in fault for not having a ticket.

The agents of a corporation, acting under instructions, must not abuse or exceed them by excessive beating; if they do, they become liable to the injured party.

An action of trespass, for assault and battery, will lie against a corporation.

A person occupying the position of superintendent, attorney for a company, conductor or station agent, notoriously and openly, will be presumed to have been duly appointed to do any act properly pertaining to such position, and within the chartered powers of the corporation.

The usual remedy for this must be case, and not trespass. If a servant does a lawful act, in an unlawful way, case would still be the proper remedy; but if the act is unlawful in itself, trespass will lie.

THIS was an action of trespass, brought by appellee against appellant and True Woodbury. The latter was not served with process.

The declaration is in the usual form.

1st count, for an assault and battery of appellee's wife.

2nd count, for an assault and battery of himself.

To this declaration the appellant's demurrer was filed, and overruled by the court.

Appellant then filed three pleas:

Not guilty, on which issue was joined.

Special pleas as follows:

And for further plea in this behalf, said defendant saith *actio non*, because at the time when, etc., the said plaintiff and Sarah H. Dalby, the wife of the said plaintiff, were passengers upon the cars of the said defendant, to be transported from Elkhart, in the county aforesaid, to Lincoln, also in said county, and that being such passengers, the conductor of the train of cars on

St. Louis, Alton & Chicago Railroad Company *v.* Dalby.

which the said plaintiff and his said wife were at the time, demanded of the said plaintiff the fare or passage money, for himself and his said wife, and the said plaintiff then and there refused to pay the said fare, and thereupon the said conductor requested the said plaintiff, at a station on said road of the said defendant, to leave the said cars or pay the said fare, and the said plaintiff then and there refused to do either, and thereupon the said conductor, and the servants of the said defendant, attempted to remove the said plaintiff from the said cars, and in so doing used no more force than was necessary, whereupon the said plaintiff, with force of arms, then and there made an assault upon the said servants of the said defendant, and would then and there have beat, bruised and wounded, and ill-treated the said servants, if said servants had not immediately then and there defended themselves against the said plaintiff, as they lawfully might, for the cause aforesaid, to wit: at the county aforesaid; and this said defendant is ready to verify, wherefore, etc.

And for further plea in this behalf, said defendant saith plaintiff *actio non,* because at the time when, etc., the said plaintiff and the said Sarah H. Dalby, the wife of the said plaintiff, were passengers upon the cars of the said defendant, and the said defendant, by its conductor, then and there demanded of and from the said plaintiff the fare or passage money of the said plaintiff and his wife, which the said plaintiff then and there refused to pay, to wit: at the county aforesaid, and the said defendant, by its said conductor, requested the said plaintiff and wife to leave the car on which the said plaintiff and wife were passengers, as aforesaid, at a station on said road, or to pay the said fare of himself and wife, which the said plaintiff then and there refused to do, and with force of arms, etc., then and there made an assault upon the servants of said defendant, to wit: at the county aforesaid, and would then and there have beat, bruised and wounded and ill-treated the said servants, if said servants had not immediately then and there defended themselves against the said plaintiff, as they lawfully might for the cause aforesaid, and this the said defendant is ready to verify, wherefore, etc.

To which were filed replications " *de injuria.*"

The following facts appear from the bills of exceptions:

The plaintiff offered *William Rankin,* the station agent of the defendant, at Elkhart, to prove that on the 4th day of April, 1857, the plaintiff applied to him for a ticket from Elkhart to Lincoln, and that he told plaintiff that he was out of tickets, and gave plaintiff, in lieu thereof, the following memorandum:

The bearer applied for tickets, and tickets are all out.
*Elkhart, 4th April,* 1857.                    W. RANKIN, *Agent.*

To which testimony the defendant objected, but said objection was overruled by the court, and the said Rankin admitted as a witness.

After the plaintiff had closed his case, defendant moved the court to exclude all the testimony which had been offered by the plaintiff, tending to show that the plaintiff had applied for a ticket at Elkhart on 4th April last, and been ¦told that there was not any on hand, and that in lieu thereof, had got from the agent a memorandum, showing that he had applied for a ticket, and the tickets were out, and that when conductor of defendant applied to plaintiff for his fare, the plaintiff handed the memorandum to defendant's conductor, with the amount of money for a ticket from Elkhart to Lincoln, at three cents a mile; which motion to exclude said evidence the court overruled.

On the trial of this cause, the defendant asked the court to give the following instructions:

No. 1. That as a common carrier, the railroad company, defendant, was under no legal obligations to furnish tickets or to carry passengers from Elkhart to Lincoln for less than four cents a mile; that the plaintiff, refusing to pay that sum, the conductor had the legal right to remove him from the cars, using no unnecessary force for that purpose; and for any such removal, the defendant, railroad company, would not be liable.

No. 2. That if the conductor, or those called to his assistance, in attempting to remove the plaintiff from the car, because of his refusal to pay his fare, willfully and intentionally beat and bruised the plaintiff, then the defendant is not responsible for such willful and intentional assault and battery.

No. 3. That the certificate of the agent of the company at Elkhart, that he had no ticket, though shown to the conductor, is not equivalent to a ticket purchased by the plaintiff at a station, and for which he would be entitled to a passage at the ticket fare of three cents per mile. Nor was the conductor bound to receive it in lieu of such ticket.

No. 4. That the company, defendant, is presumed to have authorized its servants to use none but usual means for the purpose of enforcing the regulations of the company, and if, instead of using such means, the conductor, or other servant of the company, employed any unusual, unnecessary or unjustifiable measures, then, however culpable the servants of the company may have been, or whatever their liability to the plaintiff, the company, defendant, is not responsible for the employment of such excess of means.

No. 5. That even if the general orders to the conductor of the company cars, were to put off the cars persons who refused to pay their fare, the company are not responsible in an action

of trespass for an intentional or willful assault and battery upon the plaintiff, even though expressly ordered by the conductor himself.

No. 5.   That upon the evidence in the case, the railroad company, defendant, is not responsible in the action of trespass, but if responsible at all, could only be in an action on the case, and they must therefore find for the defendant.

No. 6.   That in order to make the company, defendant, responsible in any form of action, the jury must be satisfied, from the evidence, that the particular assault and battery complained of in this case, was committed by the order of the company; and that such order of the company cannot be implied from any general directions to the conductor to collect the four cents per mile where a ticket was not presented to the conductor, or to remove from the cars persons refusing to pay their fare.

No. 7.   That, even if the company were under obligation to have tickets at their office in Elkhart, yet if the jury believe, from the evidence, that the agent at that place had been supplied with sufficient tickets for the ordinary and usual number of passengers, and that the supply was exhausted by the unusual number of passengers on that day, then that would be a legal excuse for not furnishing the plaintiff with a ticket.

No. 8.   That if the supply of tickets was such, that by an earlier application at the office for tickets, the plaintiff could have received them, then, in no event, could the company, defendant, be responsible for the consequence of his not obtaining such tickets.

No. 9.   That for a failure to supply the plaintiff with tickets, and for the consequences thereof, the defendant, the railroad company, are only responsible for an action on the case, and not in an action of trespass.

The court gave Nos. 2 and 4, and refused the others, and gave, in lieu of No. 5, an instruction marked

No. 5.   That if the general orders to the conductors of the road were, to put off the cars persons who refused to pay their fare, they are only responsible for such means as are usual and necessary in putting a man off the cars; such as laying hands on him, and taking him, forcibly and against his will, from his seat to the platform, and then putting him off.   But if, in attempting to put a man off the cars, when the man was rightfully in the cars, the conductor authorized the brakeman to beat and bruise him, and such beating and bruising was not necessary nor usual, to get a man off the cars, then the company are not responsible for, and should not be charged for, such excess of beating and bruising.

To which decision of the court, in refusing the instructions

asked for, and in giving the one in lieu of No. 5 asked, the defendant excepted.

The court, in lieu of instructions asked for by the plaintiff, gave an instruction, marked

No. 1.   The jury are instructed, that if they believe, from the evidence, that the railroad company advertised that the fare on their road was three cents a mile, provided tickets were procured at their station offices; and they further believe that Elkhart was one of their regular passenger stations on the road, where tickets were usually kept, and usually sold; that the plaintiff, on the 4th of April last, while the office was open at Elkhart, and before the time of the cars starting, applied for a ticket, and was told by the regular agent that he had none on hand, and gave to the plaintiff a memorandum, stating that he had applied for tickets, but that he was out of tickets, and could not give him any, and that when the conductor applied to plaintiff for a ticket, the plaintiff tendered to the conductor the fare from Elkhart to Lincoln, at the rate of three cents a mile, at the same time exhibiting, to the conductor, the memorandum so obtained from the agent at Elkhart, then the plaintiff had a right to pass over the road, and the conductor had no right to remove him.

And if the jury further believe, that the company authorized the conductors of their road to remove all passengers who did not pay four cents a mile, when they had not regular tickets, and that, in carrying out such directions of the company, the conductor and the brakeman committed an assault on the plaintiff, the company are responsible for the assault.

The jury returned a verdict, of which the following is a copy: "We, the jury, find the defendant guilty, in manner and form as charged in the declaration, and assess the damages of the plaintiff at one thousand dollars."

And thereupon, the railroad company filed a motion for a new trial, as follows:

The defendant, the St. Louis, Alton and Chicago Railroad Company, by their attorneys, move for a new trial in this cause,

1st.   Because the verdict is against evidence.

2nd.   Because the verdict is against the law.

3rd.   Because the court erred in refusing the instructions asked for by the defendant.

4th.   Because the court erred in giving the instructions, and modifications of instructions, given and modified by the court, other than those asked for, and given on behalf of the defendant.

5th.   Because the verdict is for excessive and exorbitant damages.

Before the decision of the court on the said motion, the plain-

St. Louis, Alton & Chicago Railroad Company *v.* Dalby.

tiff offered to, and did remit five hundred dollars of the damages so recovered, and therefore the said motion for a new trial was overruled.

The following is the evidence in this cause:

*William Rankin,* agent at Elkhart; 4th April, 1857, plaintiff applied for tickets to come to Lincoln, and I had none on hand, and he wished me to give a notice to the conductor to that effect, which I gave. The following is a copy:

The bearer applied for tickets, and tickets are all out.
*Elkhart, 4th April,* 1857.　　　　　　　　　W. RANKIN, *Agent.*

Fare from Elkhart to Lincoln, 25 cents, when tickets are got. General instructions posted up in my office; don't know whether Dalby saw general instructions; instructions posted in a conspicuous place.

### CHICAGO, ALTON AND ST. LOUIS RAILROAD.—NOTICE.

On and after November 1st, the fare on this road will be reduced to three cents per mile, to passengers purchasing tickets at the office. Passengers paying fare on the cars, will be charged at the rate of four cents per mile.

　　　　　　　　　　　　　　　A. H. MOORE, *General Superintendent.*
*Bloomington, Oct.* 28, 1856.

No authority, at that time, to receive money and give tickets; different instructions now; Elkhart is a station on the road; regular passenger station, where passengers get in and out, and tickets are sold, and I was authorized to sell tickets; the general ticket agent at Bloomington furnished me with tickets. I had sold an unusual number of tickets that day, to passengers coming to Lincoln, and when Dalby applied, I had none. The office had been open several hours before the train left; have no recollection how long before train left when Dalby applied; the ticket agent had furnished me with the ordinary supply of tickets.

*William Miller.* I was on the cars same day with Dalby, and had bought a ticket myself, coming to Lincoln; some with me had to take half tickets; Mr. Rankin observed to me that he ought to have tickets; he expected them. Dalby could not get any tickets; he asked Rankin to give him something to show on the train that he had applied for a ticket. The conductor came to Dalby, and I saw Dalby give him money, which conductor put in his pocket; don't know how much money there was; after Dalby gave him the money, or at the same time, Dalby gave him the paper from Rankin, and conductor threw it on the floor, and said it was not worth a damn, that he had to go according to orders. Some little was then said about odd change and conductor then passed on, and took in tickets from

balance of passengers; conductor came back to Dalby, and wanted to know if Dalby would pay him balance of the money, which he demanded of him, and Dalby said he would not; it was ten or twenty cents. Dalby insisted that he had paid his fare, the regular price of a ticket, and had given him what Rankin had written for him, as above; conductor put his hand in his pocket and took out some money, and tendered it back to Dalby, and Dalby refused to take the money, and the conductor put it under the seat. The conductor told Dalby he would put him off the cars at Broadwell. Before the cars checked up entirely at Broadwell, the conductor and two other men, (supposed to be brakemen,) came up to Dalby, and conductor said to brakemen, put this man off the cars, pointing to Dalby. They then took hold of him, one by the arms, and another by the top of the hair, and Dalby threw his hand out. As they were trying to pull him out, he resisted; his wife sitting next to window, and he next to aisle. In the scuffle they crowded back on Mrs. Dalby; I tried to keep them from hurting him; I expected they would hurt her; conductor and both brakemen had hold of Dalby at the same time; one of the men had his head drawn over the arm of the seat, while the others were holding him, and pounded him in the face ten or a dozen licks. Mrs. Dalby then said, hold on, boys, and I will pay you the other ten or twenty cents, and one of the men said, no, damn you, it is a half dollar; in the scuffle, Dalby tore one of the men's coats, and the man said, damn you, you tore my coat, and I will tear your hide; they let him up then, and Dalby satisfied the claim; the fuss stopped and the cars went on. He paid more than they demanded at first; he paid fifty cents, which they demanded last, after they had pounded him. Broadwell is in Logan county, where the fuss was. They crowded Dalby on to Mrs. Dalby; other women hallooed in the cars, but she did not; she looked frightened. Dalby's face pretty badly bruised up; his face black under his eyes; bruised up considerably; some bloody; bled considerable. Dalby did not go down that night on return of cars, as was his intention, as expressed before he left Elkhart. It would have been dangerous to have put Dalby off when they first took hold of him, train not being checked up; conductor told Dalby it was his orders not to let him go unless four cents a mile paid.

Cross-examined. The whistle had sounded at Broadwell, and the train was running tolerably fast, but was going as the train; can't tell, when conductor and brakeman came up, whether Dalby had his hat on or not; he saw no attempt made to strike Mrs. Dalby. When Dalby and conductor were arguing the point whether Dalby had paid him, he said his orders were that he must collect more under his orders.

*Charles H. Geer.* Was on the cars at the time; the first intimation of difficulty was unusual talk between conductor and plaintiff; this attracted my attention. Mr. Woodbury, conductor, came through cars and took a seat, (partly standing on arm of cars,) opposite Dalby, nodding his head to Dalby, and looking to back of cars; soon after that, the brakeman came through the cars, towards Mr. Dalby, and the brakeman went immediately to Mr. Dalby and took hold of him; the conductor immediately followed up; the brakeman tried to pull Dalby from his seat, and he, of course, resisted; the conductor took hold of him at the same time. I was four or five seats back, and got up and went nearer, to the second seat back; when I got there the brakeman had Dalby by the hair with his left hand, and was striking him with his right hand underneath, hitting him in the face; after striking him eight or ten times, Mr. Woodbury told brakeman to stop, which he did; then the conductor told him if he would pay the balance of his fare he might go on, he would not put him out of cars; after the conductor told the brakeman to let him go, then the brakeman said, I ought to give you two or three more for tearing my coat.

Cross-examined. I saw whole of transaction; I think, after the fuss commenced; I saw but one brakeman come up; the speed of cars was under full headway when fuss commenced; there had been no whistle, no break up, when brakeman first attacked Dalby; it would be dangerous to put a man off; whistle sounded after brakeman took hold of Dalby, as my memory serves me; no attempt to strike Mrs. Dalby.

*Dr. Thomas H. Fowler.* On the cars the same day; third or fourth seat from hind part of cars; before cars reached Broadwell, I saw a fracas or difficulty; two or three seats from front of cars; fracas induced me to walk forward; when I got within two or three steps, I saw conductor and a man I recognized as a brakeman, and a third person who was said to be a brakeman. Conductor and one brakeman had both hold of Dalby by hair of his head, and the other brakeman was striking Dalby in the face as hard as he could; they jerked Dalby almost out of his seat into aisle, and his wife was holding on by his coat; they were trying to get him out, and he, to resist, pulled back; the conductor, when Dalby handed him twenty cents, said he must have fifty cents. At Elkhart, when I applied to Rankin for tickets, he offered me half tickets, and then looked and gave me whole ticket; I told him that it was wrong, that there ought to be plenty of tickets; he said he had written for some, but they had not sent them, and there was an unusual demand that day; I got on cars at Elkhart; I think cars stopped about the time that I got up from my seat, and Dalby was greatly bruised and cut.

William Rankin, recalled. Virgil Hickox is the general agent of the company.

*William Snodgrass.* Was on the cars when the affair took place; was forward of Dalby, on next seat; saw all the fracas; the railroad men commenced fracas; took hold first; Dalby paid conductor ticket fare, and handed him "Rankin's line;" conductor wanted twenty cents more; Dalby said he reckoned not; conductor said he guessed he would; then conductor turned round, took the money and went off with it; a few minutes afterwards, he offered Dalby money, (he don't know how much it was;) conductor laid money under Dalby; then conductor went off and said he would put him off at Broadwell, and he came back with two other men that I thought were brakemen; they laid hold of him, and told him they would put him off at Broadwell, if he did not pay the other twenty cents; he said, that was his orders, if they did not get tickets, to put him off, unless paid the four cents a mile; one of the men took hold of his right arm, and one catched him by the hair of his head, and pulled him down across the end of the seat, and struck him in the face eight or ten times; Dalby told them he would pay the money, and conductor told the men to stop; the cars were running at good speed; it would have been dangerous to put a man off, the way the cars were running.

Testimony for the defense:

*J. M. Coddings.* I was on the train when affair happened; I was sitting on the opposite side of the car, three seats back; could see everything; was a passenger on train; got on at Elkhart, having come up in freight train there; the first I noticed the conductor, he laid down a paper and some money, and walked away; the conductor then went out of car, and came back again; in a few minutes they came to Broadwell; before this, Dalby got up and pulled off his coat and his hat, after they had whistled for the station, and, I think, after they had whistled to put down brakes; conductor asked him if he would not pay his fare, and he said he would not; the conductor told him that he would put him off the cars; with that, the conductor stepped in front of Dalby, and told him he must get out of the car; the brakeman and conductor took hold of him, and then Dalby got up and made attempt to strike, and they clinched; Dalby appeared to be striking at brakeman as they clinched; the brakeman's coat was torn; the brakeman then pitched in pretty sharp; I could not say whether Dalby tried to push the brakeman off, or tried to strike; I was acquainted with brakeman, and told him not to strike; just as brakeman striking last, the man said he would pay his fare, and then brakeman stopped; the train

24

was just about stopping, when conductor asked Dalby to pay his fare, or he would put him out.

Cross-examined. The coat Dalby took off was his overcoat; the conductor had passed out when this was done; there was fire in the cars; he pulled his coat off, I think, now, when conductor about half way through the cars; engineer in employ of company then and now.

*O. C. Huff.* I was on the train, also; I was employed on road; fence inspector, then; I was in same car; sat in first seat back of Dalby; the first I noticed, Dalby and conductor were talking about fare; I heard conductor say that he must pay the extra fare, twenty cents, which Dalby said he would not do; I did not hear him give any reason, because I was not noticing; conductor said he must pay it, or he would put him off; Dalby said he would not be put off without some trouble, or something to that effect; I saw Woodbury take some money out of his pocket and offer it to Dalby, and Dalby refused to take it; Woodbury tossed it down to him, and conductor told him he must pay the fare, or he would put him off at the next station, and then conductor went through cars; after conductor was gone, Dalby raised up and took off his overcoat; in a few minutes conductor came back with one brakeman, and stood by stove a minute or so, until the whistle sounded for down brakes; after whistle blew, conductor went up to Dalby and asked him if he had concluded to pay his fare, and Dalby said he had not concluded to pay his fare; then conductor said he must get off; after he had ordered him off, and Dalby did not start, he told his brakeman to put him off; the brakeman stepped up and took him by the arm, and Dalby turned around and put up his hand after brakeman took hold of him; he put up his hand, either to defend himself or to push brakeman off; I could not tell how brakeman, in the scuffle, got his coat torn; it was badly torn; brakeman got him by the hair with one hand, and hit him several blows in the face with the other; Woodbury took him by the other arm, and they tried to pull him out of seat; they did not get him out of seat; Dalby's wife helped hold him in; she seemed excited; after brakeman had hit him several times in face, some one says, you had better pay your fare, and Dalby says, I will pay, and Woodbury says, don't strike him again if he will pay; Dalby handed Woodbury some money, and Woodbury says, I want twenty cents more, and then Dalby paid it to him; the cars would have stopped by the time they got to Broadwell, if he had peaceably gone out.

*C. W. Vanderpool.* I was on the cars, sitting three or four seats back of Dalby, on the right hand side; I saw this man get up and pull off his overcoat and hat; conductor had some words

with him; I got up and went out; I did not come back until after the fracas was over.

This cause was heard before DAVIS, Judge, and a jury.

The errors assigned are as follows:

1st. The court erred in admitting in evidence the written memorandum mentioned as given by the witness, Rankin.

2nd. In overruling the defendant's motion to exclude the evidence in relation to said memorandum, as mentioned in the bill of exceptions.

3rd. The court erred in refusing the instructions asked for by defendant below, and giving the modified instruction in lieu of the one asked for by said defendant.

4th. The court erred in giving the instruction on behalf of the plaintiff below, marked No. 1.

5th. The court erred in overruling the motion of the defendant below for a new trial.

STUART & EDWARDS, for Appellant.

LINCOLN & HERNDON, for Appellee.

CATON, C. J. Some questions of minor importance will be disposed of before we come to the main and important question, which has most engrossed the attention of counsel and the court.

The first of these is, whether the court erred in admitting the testimony of Rankin, the station agent, and the certificate or written statement, given by Rankin to Dalby, at the time the latter applied for tickets and could not procure them. This involves the right of the railroad company to charge discriminating fares, and under what circumstances it may do so. The law on that subject as held by this court, and which is now adhered to, is defined in the case of *The Chicago, Burlington & Quincy Railroad Company* v. *Parks,* 18 Ill. R. 460. In that case, this court said, "Nor do we think it unreasonable or unjust that the company should charge more for passengers who neglect to get tickets, and in consequence compel the conductors to collect their fares in the cars. This is but a reasonable penalty for the neglect of the passenger, and a just compensation for the additional inconvenience to which the company is subjected by being compelled to receive the fare by the hands of the conductor. That it is sensibly and appreciably more to the advantage of the company to have the fares paid to the station agents, who issue tickets therefor, than to the conductors, our common observation, has convinced us. But to justify the company in making this discrimination in the fare against a passen-

ger who neglects to purchase a ticket at the company's office, the company must see to it that the fault was not that of its own agent instead of the passenger. To justify this discrimination, every reasonable and proper facility must be afforded the passenger to procure his ticket. It must furnish a convenient and accessible place for the sale of tickets, with a competent person in attendance, ready to sell them, which should be open and accessible to all passengers for a reasonable time before the departure of each train, and up to the time of its actual departure, so that it shall really be a case of neglect and not of necessity on the part of the passenger, and not the fault of the company. If a company well keep its ticket office closed till a crowd of clamorous passengers have gathered around, so as to make it dangerous or inconvenient for females or infirm persons to get tickets, surely the fault is not theirs, but the company's, if they do not procure tickets; and under such circumstances, to charge them more than the price established for tickets, would be but an imposition and an outrage which the law cannot sanction." We are aware that, in the case of *Crocker* v. *New London Railroad Co.*, 24 Conn. R. 249, SANDFORD, J., held, with the concurrence of WAITE, C. J., that the ticket agent might close his office at any time; and that thereby, the proposition of the railroad company to the public, to sell tickets at fifty cents, was withdrawn, and, for the time being, the company only occupied the position of offering to carry passengers over that route at fifty-five cents. That became the universal fare during the time the office was closed. We confess this seems to us too much like trifling with the public. The same principle would allow the station agent to charge sixty cents one day for the same ticket, and the next day sixty-five cents, provided he could prove that to be a reasonable fare. It makes the whim or caprice or even neglect of every agent the solemn act of the company, to change every hour the tariff of charges, held out to the public as the price of a particular service. It utterly destroys this doctrine of uniformity of charges, which however, they evidently recognized as good law, and intended not to disturb. But two others of the judges, STORRS and HINMAN, did not concur with SANFORD upon this part of the case, and held with us, that the company must afford reasonable facilities to get tickets, and that it must be the fault of the passenger and not of the company, to authorize the extra charge for the want of a ticket.

We adhere to the rule laid down in the 18 Ill. R., and what was said in that case in vindication of the rule is particularly applicable to this case. Here the passenger applied to the station agent for tickets, and was told that he was out of tickets

and could sell him none, and gave the passenger a written statement to that effect, to show to the conductor, and also told the conductor, personally, the same fact.    And the objection is, that the plaintiff was allowed to prove these facts by the station agent.    Indeed we are entirely unable to comprehend the least sort of objection to the facts proved or the mode of proof. Every particle of this evidence was precisely to the point that it was not the fault of the passenger that he had not got tickets, and that he had neglected no precaution to bring the knowledge of this home to the conductor.    The written memorandum of the station agent was not used for the purpose of establishing the fact that the passenger had applied for tickets and could not procure them.    That fact was shown by the testimony of the agent and several other witnesses on the trial, in their oral testimony.    The writing was an independent fact of itself, and used as such, for the purpose of bringing home to the knowledge of the conductor, the truth, that the passenger had done all he could to procure tickets, and thereby had entitled himself to the right to ride at the ticket fare.    But even had it been offered as original evidence to prove the primary fact that it stated, we are not now prepared to say that it was not competent to prove it.    Had it stated that the passenger had paid his fare, instead of stating the reason why he had not done so, then it would have become a ticket, as well as if it had been a printed one usually sold; and it will hardly be denied that a ticket sold by a station agent is not evidence of itself that the passenger has paid his fare.    But, be this as it may, it was competent for the purpose of showing that the conductor was informed that the fault for his not having a ticket was that of the company, and not of the passenger.

The jury had a right to find, from the evidence and the instructions in this case, that the general superintendent of this road had ordered his conductors to charge all passengers, who had not tickets, no matter from what cause, one cent per mile more than the price established for tickets, and to remove from the cars all who should refuse to pay the fare thus demanded. We are satisfied, we say, from the evidence, that the jury were authorized to come to these conclusions, and unless they had so found, they could not have returned the verdict which they did. They must also have found, further, that the conductor, in pursuance of such general orders, did attempt to remove the plaintiff from the cars, when, by the law as laid down by the court, he had no right to do so.    Upon this point, indeed, there was no room for controversy; for, as we have already seen, the passenger had done all he could to get tickets, which the conductor knew from a source which he could not doubt, and then the

plaintiff offered to pay the price of a ticket, which the conductor refused, and demanded the extra cent per mile, and because he refused to pay this, the conductor and two brakemen committed the assault. The evidence indeed shows a most brutal and outrageous assault and battery, which is calculated to excite the feelings of indignation against the conductor and brakemen, and there was no doubt great danger that the jury might extend that feeling to the railroad company also. On this subject the Circuit Court instructed the jury that the company was not responsible for any excess of beating or violence, more than was necessary to carry out the orders of the company. We are not to presume that those orders were to use any more force than would be requisite in expelling the party from the cars, and only so much as would be justified, had it been a case where the party actually refused to pay his fare, when the company would have a right to expel him. Whatever of beating there was more than was necessary to carry out the orders of the company, the agents made their individual acts, and must answer for them to the injured party.

We now approach the great question in the case which has been presented as of paramount importance, as settling a principle which must affect all railroad companies, and that is, Whether a private corporation can, in any case, become liable for an assault and battery. This question has been argued with much earnestness and ability, and has not been lightly considered by the court.

Private corporations for commercial and manufacturing purposes have been known as long, at least, as the institution of the civil law, but it has been reserved to our own times to see them so enlarged and multiplied as to engross to themselves, almost exclusively, many of the most important branches of industry and commerce. The advancement of the arts and sciences, and of the wants of men, have opened up so many new and important means for the benefit of mankind, which cannot, from their nature, be accomplished by individual resources and skill, that the aggregation of capital, and a combination of energies, have been found indispensable to the accomplishment of objects never before thought of, and which so eminently mark the rapidly advancing civilization of the present age. Formerly, the ends to be accomplished for the good of society but rarely required the combination of the capital and skill of many individuals, and but few private corporations were created, and these cut so small a comparative figure in the destinies of states, that they attracted but little attention on the part of the law makers, and were but little studied by the courts. Even in England, until a very recent period, both public and private

corporations were created by royal prerogative, without the intervention of Parliament, and were invested with such powers and privileges as favorites might ask, or the public good might be supposed to require. But even then such incorporations were rare, and generally only granted as special favors, or upon extraordinary occasions. Then but few occasions of public necessity required them. Now they have become among the greatest means of state and national prosperity, and without them, that tide of national greatness and public prosperity which distinguishes this above all former times, would be rolled back; if society itself, did not become disorganized. It may be, and no doubt is true, that this consciousness of the public necessities for private corporations, to accomplish so many objects of public good, has led to the creation of too many of these corporations. Indeed, their multiplication is astonishing, if not alarming. It may be, and probably is true, that more private corporations were created by our own legislature, at its last session, than existed in the whole civilized world at the commencement of the present century. This state of things has necessarily led to a more careful study of the whole subject, both by legislators and courts. Experience, that safest teacher to those who will observe and reflect, has enabled our law makers to more accurately judge what powers should be conferred upon a corporation to accomplish a particular object, so that, as far as practicable, capital may be induced to undertake the enterprise, and shall be justly protected; and, on the other hand, to protect the rights of the public and individuals against encroachments and oppression by the corporations. So, too, of the courts. The rights and liabilities of private corporations have been more the subjects of discussion before, and reflection by, the courts within the last few years, than ever previous. Now are constantly brought before them corporations, created for purposes never before heard of, and in order to enable them efficiently to accomplish these purposes, they have been necessarily clothed with powers in some respects new and extraordinary, and it has become the duty of the courts so to administer the law as to secure them in the full enjoyment of those powers, and to protect the public and individuals against the abuse of those powers. It is only by looking at the powers conferred upon these corporations that we can correctly determine what remedies should be enforced against them for the abuse of those powers. It follows, as a necessary legal consequence, that if, by the exercise of the powers, either expressed or implied, which they possess, they commit a particular wrong, they must be held responsible for such wrong, and the courts must neces-

sarily adopt the known and appropriate remedy for the redress of such wrong.

This principle of applying known remedies to the exigencies of new cases as they arise, is one of the great pillars of strength of the common law, without which, it would have fallen and broken to pieces, by its own rigidity, centuries ago. He who studies the common law only by looking at the decisions which have been made under it, without studying its philosophy, and understanding the reasons which prompted those decisions, can never become fully imbued with its true doctrines. He is compelled to say, that where there is no precedent, there is no law. The decisions under the common law are most surely its expounders, but, in order to understand such expositions, we must understand why such decisions were made, and such decisions do not become precedents for the government of any other case where those reasons do not exist; and it may safely be said, as a general rule, that decisions which are only supported by fallacies are not true exponents of the common law, and such decisions must be often repeated and long acquiesced in, before they become what are considered authorities. In such cases, it may be better, no doubt, for the legislature than for the courts to change them.

In order to apply these principles to the case before us, that we may determine whether this action of trespass for assault and battery can be maintained against a railroad corporation, it is necessary to ascertain first whether the corporation had the right to order its conductor to expel a person from its cars. To deny to a railroad corporation the power to expel persons from its cars, would be substantially to destroy its franchise to carry passengers. This is a sort of police power, which they must have the right to exercise, in order to make them fit and safe places for the conveyance of passengers, as well as to secure to them a suitable reward for their services. For the latter purpose, this right has been secured to them in this State by express statute, and as an implied power, they possess it for other purposes as essential to the public good and their own protection, for the enjoyment of rights which are expressly given. This power has been upheld by all courts, so far as we are advised, wherever the question has arisen, and probably this corporation would be as little likely as others to deny that it possesses this right. Now, shall it not be responsible for the abuse of the powers with which it is thus clothed? This has always been maintained by all courts, in all times and in all places, and must be considered as not to be questioned. But the answer urged is, that as the corporation has no lawful authority to order an unlawful act to be done, or to order a

lawful act to be done in an improper way, or so that it shall violate the rights of others, the act, whenever such is the case, becomes the act of the agent, and not of the corporation. However specious this reasoning may at first appear, it will not bear the test of a practical application and of sound reason. It will not afford that measure of protection to the public and individuals which is necessary, in order to protect corporations themselves in the proper enjoyment of their indispensable rights, and which results from a due regard to reciprocal obligations and benefits. It is not to be presumed that the legislature would ever grant or suffer such rights to exist, if the restraining influence of a just responsibility for the abuse of those powers were not to attach to their exercise.

If the position contended for were adopted, a corporation could never be held liable for any affirmative act; for whenever such affirmative act is a violation of the rights of another, the ready and invariable answer would be, that because such act was wrongful, it was therefore unlawful, and not authorized by its charter, and hence not the act of the corporation, but the individual act of those who represent it and exercise its functions. It is often a very nice and difficult question to determine whether a particular act has been justifiable and legally right or not; and according to the doctrine advanced, it could never be known whether it was the act of the corporation or of its servants alone, until this court had determined whether the act were justifiable by the law. Take a case where the company had built its road, over private property. If, in the proceeding to condemn the land, all the forms of the law had been substantially complied with, then the act was but the legitimate exercise of a power conferred by law, and no wrong was done; but if not, then the act was not the legitimate exercise of such a power, and a trespass was committed — but not by the company; no, for their charter did not authorize them to commit a trespass, and the injured party must be turned over to the servants of the company who ordered the act, or to the laborers who executed it. The result in all cases must be this: if the act was right and lawful, then it is the company's; but if it was wrong and not legally justifiable, then it was not the act of the company, which, it will be said, was a stranger to it. The result of the position is, that the company cannot be liable for any trespass, for a trespass is an unlawful act, and no company or corporation can be legitimately empowered to do an unlawful act. Now, there are cases to be found — mostly in the Year Books, it is true — where courts have been misled by this sort of reasoning, and held that no corporation can be liable for any trespass. But such never was the rule either of the civil or the

common law, as applied to private remedies for such wrongs; and it was freely admitted, on the argument by the counsel for the corporation, that the company must be liable for a trespass, where it receives the benefit of the tortuous act. This is conceding all we are at the present moment seeking to establish, although the limitation attached to this concession is not applicable to trespasses committed under an order of the corporation, but only such as are committed without such order, but for its supposed benefit, and which it afterwards sanctions and adopts by appropriating the benefit resulting from the trespass. It admits the company liable for acts which its charter did not justify it in committing, and admits its liability in the form of an action of trespass. If this be so, it follows as an inevitable consequence, by every rule of legal reasoning, that it must be liable for a trespass to the person as well as to property.

The reason assigned by some why a corporation cannot be liable for an assault and battery, is, that it has no body to give or receive an injury. This is one of the reasons, found in the Year Books, why no trespass can be done by corporations; but not one of those old cases makes any distinction between trespass to the person and trespass to property. They denied it all. The proposition involves the assertion of the inability of the corporation to do any physical act. It is, however, now referred to only for the purpose of showing that a corporation cannot commit an assault and battery, while it is admitted that it may commit a trespass on property. It may require no more physical exertion to injure one's person than his property. How absurd to say that if the servant of the company throws the passenger's baggage from the cars, it is the act of the company, but if he throws off the passenger himself, it is not. Is his person less sacred, and less under the protection of the law, than his property? The company is necessarily, in the exercise of its rights and franchises, constantly liable to be brought in collision with the persons of individuals. It has the same right which an individual would have under the same circumstances to protect its cars and premises from the unlawful intrusion of strangers, and in the exercise of such rights by its servants, upon every principle of just reasoning, it must be considered to be constructively present and commanding the act. Such is the rule in relation to individuals, expressed rather to simplify the idea of their liability for the act, than for any other purpose, and there is even more propriety in applying this fiction to corporations than to individuals, for they in truth can never be physically present at the doing of any acts by their servants, while an individual may be. The company's engineer may expel a man from the engine who forces himself upon it, and this is the act of the

company, and if an excess of force is used, a trespass is committed, and that trespass was an assault and battery. This trespass to the person is no more an abuse of the powers confided to the company, than is any trespass committed upon property by the servant when in the exercise of a power of the chartered company. In the one case it is admitted that the company is liable in an action of trespass, and if there be any reason or harmony in the law, it must be equally and in the same form, liable in the other. Suppose the servants of the company are by the proper authority directed to take the wood of an individual to supply an engine, it is admitted on all hands, that the company would be liable in an action of trespass for the tort; then suppose the owner of the wood, as he would have a perfect legal right to do, should attempt to protect his property, and in doing so, is injured by the servants of the company, it would be strange indeed, if he may sue the company for the trespass to his property and not to his person. In neither case would the law authorize the tort, but it would authorize generally the supplying the engine with wood, and in doing the act thus authorized, the tortuous acts were committed, for which, if there is a liability in one case there must be in the other. It is simply an abuse of an acknowledged power, for which the company must be responsible in the acknowledged form of law prescribed for such injuries. So, in the case before us, the company had a right to expel persons from its cars, but that, like all other powers confided to it, was liable to be abused, and when it is abused, the company must be responsible for such abuse.

Perhaps the only case to be met with, where it was held that a corporation could not be held responsible for assault and battery, is that of *Orr* v. *Bank of the United States*, 1 Hammond R. 36, decided thirty-seven years ago by the Supreme Court of Ohio. That was an action of assault and battery against the bank and an individual, and the court held that the bank could not commit an assault, and relied entirely for its support upon the old cases, where it was said that a corporation could not commit a trespass. In denying the right to maintain that action, the court was forced upon the ground that no trespass can be committed by a corporation. Not one of the cases referred to by that court in support of its decision, seems to have been for assault and battery; but all go to the point of trespass generally. Indeed, so far as our researches have extended, the case in Hammond is the first one where the question was raised, whether a corporation could be liable for assault and battery, and, from necessity, the court had to rely for authorities upon those most analogous, which were those of trespass to property, and unfortunately the court fell upon a few old decisions—some

dicta which are now admitted not to be the law. Two reasons were assigned by the ancients for their law; one was, that "a *capias* and *exigent* did not lie against a corporation;" and the other, that "a corporation cannot beat or be beaten." The court in Ohio admit that the first reason had entirely ceased to exist under their practice; but fondly adhere to the last. They say, "It is not, however, admitted that all the reasons, or that the most weighty reasons of the law question have ceased; for, although the distinction of process is done away by our statute, yet it remains a truth that a corporation aggregate, as such, cannot commit the act charged in this declaration, as they have no personal existence, and can neither beat nor be beaten." It seems to us that this reasoning must be fallacious, if a corporation is capable of doing any physical act so far as to become responsible for it. It requires no greater physical exertion to injure a person than his property, and he who denies the liability for the trespass to the person, is, like the court in Ohio, driven to the denial of liability for trespass to property. The one, in principle and reason, necessarily follows the other. The case of *Vanderbilt* v. *The Richmond Turnpike Company*, 2 Comst. R. 479, is supposed to lend some countenance to this position, but even a casual perusal of the opinion of the court will show that it does not. There it was admitted that the liability of the company was the same as would have been that of an individual under the same circumstances, but it was held that the trespass in that case was such that an individual proprietor of the boat would not have been liable for it.

Angell & Ames on Corp., chap. 9, § 10, say: "As natural persons are liable for the wrongful acts and neglects of their servants and agents, done in the course and within the scope of their employment, so are corporations, upon the same grounds, in the same manner, and to the same extent." Again, in chap. 11, § 7, they say: "When we consider the above authorities, ancient and modern, as to the liability of corporations to be sued, and when we also consider that it is the policy of the present day, especially in the United States, to attach to them the same liabilities to which natural persons are subject, there can be no doubt that they are subject, generally speaking, to the same liability to be sued as any common individual." And this is said in reference to their liability in actions for trespass.

Pierce on American Railroad Law, 234, says: "An action of trespass lies against a corporation where the trespass is authorized or subsequently ratified by it." And Redfield on Railways, 380, says: "But the disposition of courts has been to give such agents and servants a large and liberal discretion, and hold the companies liable for all their acts within the most extensive

range of their charter powers. This seems the only construction which will be safe, or just, or, indeed, practicable. It has long been settled that corporations are liable for torts committed by their agents in the discharge of the business of their employment and within the proper range of such employment." In the notes to this section the authorities are industriously collected, showing the general liability of corporations, in the action of trespass for wrongs done by their servants, to which alone we deem it necessary to refer, especially as the doctrine is not denied.

But this identical question is well settled by the adjudication of both the English and American courts, although it has not often arisen. *The Eastern Counties Railway and Richardson* v. *Broom*, 6 Exch. R. 314, (by Welsby, Hurlston and Gordon,) was an action for an assault and battery, brought against the company and its servant jointly, and the question was raised on the declaration whether the action could be maintained, and it was sustained by the unanimous opinion of all the Judges in the Exchequer Chamber. In delivering the opinion of the court, PATTERSON, Judge, said: " It is alleged on the part of the plaintiffs in error, as a general broad proposition of law, that in no case can an action of trespass for assault and battery lie against a corporation aggregate. Whatever may be the effect of the authorites in the Year Books, it has been expressly held in modern times that trespass will lie against a corporation aggregate for breaking and entering a close and for seizing goods. This has been decided by several recent cases. The question then is, whether trespass for assault and battery may lie against a corporation ; and it has been contended that it cannot ; for it is said that it can neither beat nor be beaten. No doubt that proposition is true as it respects its corporate capacity. But it does not therefore follow that if a corporation, under seal, direct a servant to apprehend and imprison a particular person, an action for assault and battery cannot be maintained against the corporation. The learned counsel who appear for the plaintiffs in error, must contend, in order to show that this declaration cannot be supported, that no such action will lie. But we are clearly of opinion that it is not so, and that an action of trespass for assault and battery will lie against a corporation, whenever the corporation can authorize the act done, and it is done by their authority." It was also held in the same case that the authority need not be under seal, and even that the corporation might become liable by ratifying the act after it was done, where the act was intended for the benefit of the company. In the case of *Chilton* v. *London and Croydon Railway Company*, 16 M. & W. 212,

an action of trespass for an assault was maintained against the company.

The case of *Moore* v. *Fitchburg Railroad Company*, 4 Gray (Mass.) R. 465, is also directly to the point under consideration. That was an action for assault and false imprisonment, brought against the company and its conductor jointly, and the action was maintained. By statute in Massachusetts, both actions of trespass, and trespass on the case, are called actions for tort, and so was the action called here, but that cannot alter the principle necessarily determined in the decision of the case. In that case the court said, " There is no difficulty in joining the corporation with their servant in the same action." This could only be done in trespass, and not in case, so it as well designates the form of the action as if there had been no change by their statute.

The last case to which we shall refer in support of this position, is that of *Crocker* v. *The New London Railroad Company*, 24 Conn. R. 249. That was an action of trespass *vi et armis*, for forcibly removing the plaintiff from the cars, when he had a right to remain in, and the court below instructed the jury that if they believed the facts as alleged to have been proved, the plaintiff was entitled to recover in that action, and upon this part of the charge the Supreme Court said: " Upon the second point the legal principles enunciated in the charge are, in my judgment, correct. If the plaintiff was wrongfully put out of the car, he had a right to re-enter, and if, in his endeavor to do so, he received an injury in the manner stated in the motion, he was entitled to recover for such injury, unless there was, on his part, a want of reasonable care and prudence, which produced, or essentially contributed to produce, said injury." In this part of the opinion all the judges concurred.

Upon authority then, as well as principle, we find the law well settled, that a corporation may as well be liable for an assault and battery, as for any other tort which may be committed by its servants. The same authority, as well as the same reasons, which support the one, must maintain the other. If either is denied, both must be rejected. The idea that a corporation cannot be liable for beating because it has no body to be beaten, must be founded on the assumption that no party can inflict an injury which it is not capable of receiving. We confess to a want of respect when such whimsical notions are advanced by grave and learned Judges. As well might it be said that a man cannot commit a rape because he cannot be the subject of one.

The question may be asked, what evidence shall be required, to show that the act of the agent was done by the order of the company so as to make it responsible for such act ? The answer

is obvious, and has been indicated by the quotation already made from Redfield on Railways. The same evidence should be required of authority from the company, in cases where it is sought to be made responsible for a tort, as in cases where it is sought to be made responsible upon a contract. If a man occupies the position of general superintendent, conductor, station agent or attorney, for a company, and is in the open and notorious exercise of the duties of such position, the presumption is that he has been appointed by the proper authorities of the company to such place, and has been authorized by the company to do any act properly pertaining to such position, and within the chartered powers of the company to do. Under an enlarged and liberal construction of such powers, and within such appropriate sphere, the company must be responsible for all his acts, as much as if an express order of the board of directors or stockholders were shown, ordering him to do the particular act. The public cannot deal with the company in person, but only through its agents, and cannot be required to go and examine the written records of its proceedings, to see who have been appointed to particular places, and with what specific powers they have been clothed. It is enough, if the company suffers particular persons, openly and notoriously, to occupy particular places of responsibility in its service, without contradiction. Such acquiescence estops the company to deny the appointment, and appropriate authority incident thereto. Such is the universally adopted rule in relation to contracts, and it applies with equal propriety to torts.

Much was said upon the argument, of the hardship it would impose upon railroad companies should this action be sustained. It is supposed that it would authorize trespass against the company wherever it could be maintained against the servant, and that the action on the case, which is now the usual remedy, would be superseded for trespass. This apprehension is not well founded. Hereafter, as heretofore, the usual remedy for torts must be case, and not trespass. Wherever the command was to do only a lawful act, and the servant does it in an unlawful way, so as to injure another, there case would still be the proper remedy. *Illinois Central Railroad Company* v. *Reedy,* 17 Ill. R. 580. But where the act is unlawful in and of itself, and not from the mode of doing it, trespass would lie. This case may serve to illustrate: Suppose the passenger had actually refused to pay his fare, then the act of removing him from the cars would have been lawful, and if the conductor had done this lawful act so carelessly as to produce an injury, the remedy would have been case against the company; but as he did not refuse to pay the fare which he was legally bound to pay, the

act of attempting to remove him from the cars was itself unlawful, and trespass may be maintained. There may also be cases where, from the very nature of the injury, trespass would be the only proper form of action, when, of course, it must be resorted to, if there be any liability.

The judgment must be affirmed.

*Judgment affirmed.*