| 55 | 413 |
| 96 | 281 |
| 96 | 433 |
| 55 | 413 |
| 109 | 227 |
| 55 | 413 |
| 114 | 126 |
| 55 | 413 |
| 116 | 58 |
| 116 | 66 |
| 55 | 413 |
| 124 | 167 |

# Perry *v.* New Orleans, Mobile & Chattanooga Railroad Company.

*Bill in Equity for Injunction against Railroad Company.*

1. *State police power over public streets of city ; to what uses streets may be applied.*—The public streets of an incorporated city or town, whether dedicated by the owners of the fee, or acquired in the exercise of the right of eminent domain, are subject to the sovereign police power of the State ; and the legislature may, by express enactment, authorize a railroad company to lay its track across or through them ; but, where the streets have been dedicated to the public as highways, the ultimate fee remaining in the original owners of the

[Perry v. New Orleans, Mobile & Chattanooga Railroad Company.]

soil, the municipal corporation can not, in the absence of express legislative authority, allow them to be used for that purpose by a railroad company, to the injury of the succeeding proprietors of the adjacent lands.

2. *Railroad charter; not judicially noticed.*—The charter of an incorporated railroad company is a private statute, of which the courts can not take judicial notice; and in the Chancery Court, it must be pleaded as well as proved, although the statute (Rev. Code, § 2698) dispenses with the necessity of pleading it specially in the courts of law.

3. *Certainty requisite in allegations.*—An averment, in a bill in chancery, that the passage of a municipal ordinance was procured by bribery, not specifying the names of the officers bribed, nor the sums paid or promised, is not sufficiently definite and certain on demurrer.

APPEAL from the Chancery Court of Mobile.

Heard before the Hon. A. W. DILLARD.

The original bill in this case was filed on the 17th December, 1870, by Nelson W. Perry and others, owners of city lots in Mobile fronting on Commerce street, on behalf of themselves "and such other persons as may associate themselves herein, having a common interest in the rights hereinafter named," against the New Orleans, Mobile & Chattanooga Railroad Company, a corporation created in Alabama by an act of the legislature approved November 24, 1866, and re-enacted, with amendments, on the 12th August, 1868; and sought to enjoin and restrain the said railroad corporation from laying its track and running its cars through and along Commerce street, as it was proceeding to do under authority conferred, or supposed to be conferred, by an ordinance of the municipal corporation of the city of Mobile. The material averments of the bill are the following:

"Your orators have a clear and undisputed title to their said lots and buildings, properly recorded, extending back to the grants from the Spanish government, and the confirmation of the same by acts of congress of the United States in the years 1819 and 1823; and have been in possession of the same, under such title, for more than ten years, and have paid large taxes, which have been laid thereon by the State and city authorities. They further show, that Commerce street is the principal business street of the city of Mobile; that larger stocks of goods are kept and sold on that street than on any other; and that from Church street on the south, to Beauregard street on the north, said street is the principal thoroughfare for business, and for the passage of wagons, carts, drays, and other vehicles for the transportation of merchandise, and is constantly thronged with vehicles and passengers. They further show, that Commerce street is an old street, opened more than thirty years ago, by the owners of the lands over and through which it passes, for their own convenience, and was by them permitted to be used by other citizens and travellers as a public highway, and has ever

since continued, and now is such public street or thorough-fare; and that said complainants, and all other owners of lands fronting on said street, own the lands in front of their buildings, to the center of said street, subject only to the public easement, or right of way over it, acquired as before stated; and the city has never been the owner of the fee, or soil, of any part of said street.

"Your orators further show, that the New Orleans, Mobile & Chattanooga Railroad Company, incorporated by the legislature of Alabama, and owning and operating a railroad for the transportation of freight and passengers, from the city of Mobile, Alabama, to the city of New Orleans in Louisiana, having and using as the terminus of said road in Mobile their depot, workshop, and other buildings, in the southern part of said city, on lots fronting on the river, and south of Charleston street, have recently, within the last eight or ten days, commenced the extension of their track from their said depot, and have already laid down the cross-ties and rails, from their said depot, along the course of Water street, running northwardly nearly to the point where Eslava street crosses Water street, thence northeastwardly to Commerce street; and are now engaged, with a large number of hands, in taking up the stone pavement on Commerce street, and laying down cross-ties and iron rails on the same, between Church and Government streets, with the purpose and intention of continuing said work, and laying said track, along said Commerce street to its northern terminus, and of operating and using the same for the passage of regular trains of cars, in connection with its road, now running from Mobile to New Orleans. Within the space of ground between Government street and the northern terminus of Commerce street, the chief business of the city is carried on, and the width of the street between the sidewalks is from fifty to fifty-five feet. Complainants beg leave to present with this bill a diagram of that part of the city; and they show to your Honor that access to and from the wharves and the river front, where ships, steamboats, and other watercraft lie, and where they are loaded and unloaded, is only across Commerce street; and that the running and operating passenger and freight trains along said street will seriously delay passengers and vehicles in crossing the same, will obstruct the free and common use of the street for all other persons and purposes, and will impair and seriously damage the value of the lots and buildings of complainants, and of all others owning property thereon.

"Complainants further show, that said railroad company have made no application to them, or to the other owners of

the property on said street, for permission or authority to use the same for their said road, but are proceeding, as complainants are informed, under a pretended ordinance of the corporate authorities of the city of Mobile, adopted on the —— day of ———, 1869, a copy of which is added to this bill as 'Exhibit A;' and complainants show, that said ordinance is without authority of law, and is beyond the power conferred on the corporate authorities by the city charter, to which they now refer. *And complainants further state, that they are informed and believe that the said railroad company, by confederating with others, procured the passage of said ordinance by fraud, and the payment or promise of money or bonds, to certain members of the city boards;* and they charge that said ordinance is the grant of a perpetual franchise and monopoly in a public street, for the exclusive use and private interest of this corporation, to the great damage and injury of complainants and all other owners on and in said street, and without making to them any compensation therefor, as well as to the hindrance, inconvenience, and injury of the public, in the use of said street as a highway for travel and for business. Complainants further show, that said street is too narrow to admit the establishing and running of such railway, consistently with the rights and interests of the people of the city; and, if established, it will be a public nuisance, will necessarily divert travel and business to other streets, thereby causing a depreciation of the value of all the lands and buildings located on said street, and the rents and incomes thereof."

An exception was sustained to the charge of fraud and bribery in the passage of the ordinance, as contained in the words which are italicized, and leave given to the complainants to amend their bill in that particular, "so as to charge fraud distinctly," and also to file a supplemental bill, setting up the repeal of the ordinance. An amended and supplemental bill was accordingly filed, which alleged that the ordinance had been repealed by the municipal authorities after the filing of the original bill, and contained the following allegations as to the passage of said ordinance : "Your orators are informed and believe, and upon such information and belief state, that said New Orleans, Mobile & Chattanooga Railroad Company procured the passage of the said ordinance by fraud and bribery; that said railroad company, through its officers and agents, combining and confederating, craftily and subtly, to wrong the people of the city of Mobile, including your orators, in this behalf, and fraudulently and corruptly intending to impose upon your orators the burdens of taxation, and to impair and injure their right to

[Perry v. New Orleans, Mobile & Chattanooga Railroad Company.]

the free use of Commerce street, and to secure to said railroad a burdensome and onerous monopoly in the use of the same by the said railroad for its own benefit, against common right and common interest, did corruptly, fraudulently and unlawfully procure the passage of the said ordinance, by the use of corrupt, fraudulent, and illegal application of bribes, and other seductive and criminal means, with and among the members of said city government, and to subserve their own selfish and sordid objects; and your orators state, on information and belief, that the parties purposely kept their fraudulent conduct aforesaid secret, so that your orators are unable to state the details of said fraud with particularity; but your orators state, on information and belief, that among other corrupt means resorted to, to procure the passage of said ordinance, said railroad, through its officers or agents, promised to divers members of said city boards, to allow them to have a large quantity of the bonds provided by said ordinance, and that said ordinance was pa ᵤd in consequence of said promises, and other corrupt means and appliances."

The said city ordinance is set out at length in the report of the case of *New Orleans, Mobile & Chattanooga R. R. Co. v. Dunn*, 51 Ala. 128. The 5th section, granting the right of way through the streets of the city, is in these words : " *Be it further ordained*, that there is granted to the said New Orleans, Mobile & Chattanooga Railroad Company the right of way through any of the intervening streets between Madison and Charleston streets, east of and including St. Emanuel street, necessary to lay thereon its rails, and run thereon its locomotives, cars, &c., with all necessary turnouts and switches; also, the right to lay a single track, with the necessary sidings and turnouts, from the northern boundary of its depot, as the same may be located, northerly, through Commerce street to Beauregard street; thence northwardly, with tracks to connect with other roads, in such manner as said company may deem expedient and necessary for its business and interests." The act incorporating the city of Mobile, approved February 2, 1866, may be found in the Session Acts of 1865–6, pp. 202–36, but it is not necessary to copy any portions of it here.

The defendant demurred to the bill, assigning the following (with other) causes of demurrer : " That it does not show any such private right in the complainants, nor any such injury, as will entitle them to the remedy by injunction;" " that the laying of a railroad track in the streets is not a nuisance;" " that by the law of the State it is declared lawful to do so, and therefore it is not a nuisance;" " that no such

injury is shown to the public, nor to the complainants, as will authorize a decree on this bill;" "that an injunction will not lie for the matters set forth in the bill, nor is any relief in equity allowable under it." The chancellor sustained the demurrer, and dissolved the injunction on the denials of the answer, which requires no notice; and holding that the bill could not be amended, so as to present a proper case for equitable relief, he dismissed it for want of equity; and his decree is now assigned as error.

D. C. ANDERSON, and R. H. SMITH, for appellants.

GEO. N. STEWART, and ALEX. McKINSTRY, contra.

(No briefs have come to the hands of the Reporter.)

STONE J.—The most important question that can be raised on this record, makes it our duty to inquire into the police power of the State, and the extent to which its exercise may be carried in the control of private property. The introduction of railroads, as highways of travel and transportation, has seemingly disturbed some of the old landmarks, and requires of the courts, in accommodation to the spirit of progress, that we apply principles, long well understood, to new conditions and exigencies. "All property," says an eminent authority, "is held subject to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from being injurious, and to such reasonable restraints and regulations, established by law, as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient.—Commonwealth v. Alger, 7 Cush. 84–5, per SHAW, C. J. "By this general police power of the State, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the State; of the perfect right in the legislature to do which, no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned."—Thorpe v. Rutland & Burlington R. R., 27 Verm. 140, 149.

In the earlier history of railroads, controversies frequently arose as to how far private rights, privileges, easements, and even chartered privileges, could be impaired, or invaded, in their construction and operation. The controversy that arose over the Wheeling bridge is a memorable instance of

the obstinate resistance opposed by the public, at that time, to the asserted right to obstruct the navigation of the Ohio river, one of the great arteries of river commerce.—See *Pennsylvania v. Wheeling Bridge Co.*, 13 How. 518 ; *S. C.* 18 How. 421. In the first hearing of that case, it was declared by a majority of the court, that the bridge was a public nuisance, injurious to the legal rights and interests of the State of Pennsylvania, the party complaining in that suit. Ch. J. TANEY, with whom Justice Daniel concurred, dissented, and, among other things, employed the following strong language :

"I am by no means prepared to say, that the bridge would be a public nuisance even at common law. The evidence of the degree in which it obstructs navigation is exceedingly voluminous, and it is impossible to go fully into an examination of its comparative weight, in a manner that would do justice to the subject, without making this opinion itself a volume. It is sufficient to say, that in all questions of this kind, the general convenience and interest of the public, in the travel and trade across the river, as well as on its waters, must be taken into consideration. For, whether it is a public nuisance or not, depends upon whether it is or is not injurious to the public. The cases in the State courts, and in the Circuit Courts of the United States, referred to in the argument, which I shall not stop here to examine, in my opinion maintain this doctrine ; and upon principle, independently of adjudications, it cannot be otherwise. A structure which promotes the convenience of the public, cannot be a nuisance to it. And the public, whose interests are to be looked to in this case, is not the public of any particular town, or district of country, or State, or States, but the great public of the whole Union. Taking this view of the question, and looking to the testimony as set forth in the record, and more especially to that unerring test—*experience*—which the lapse of time has afforded, I am convinced that the detriment and inconvenience to the commerce and travel on the river is small and occasional only, while the advantages which the public derives from the passage over are great and constant ; and if the courts of the United States had common-law jurisdiction, and the question was legally before us to determine whether this bridge was a public nuisance or not, I am of opinion that it is not ; and that the advantages which the great body of the people of the United States reap from it, outweigh the disadvantages and inconvenience sustained by the commerce and navigation of the river."

Before the case went a second time before the Supreme Court, an act of congress had been passed, declaring " that

the bridges across the Ohio river at Wheeling in the State
of Virginia, and at Bridgeport in the State of Ohio, abutting
on Zane's Island in said river, are hereby declared to be
lawful structures in their present positions and elevations,"
&c. It was held that this act legalized the bridges, from that
time forth. The substance of the decision was, that "the
bridge no longer being an unlawful interference with a public
right, the defendant's authority to maintain it, in its then
position and height, existed from the moment of the enact-
ment; for their authority then combined the concurrent powers
of both governments, State and Federal; and if these are not
sufficient, none can be found in our system."—18 How. 421.

Speaking on the same subject, the Supreme Court of the
United States said, in *Gilman v. Philadelphia*, 3 Wall. 713,
729: "It must not be forgotten, that bridges, which are con-
necting parts of turnpikes, streets, and railroads, are means
of commercial transportation, as well as navigable waters;
and that the commerce which passes over a bridge may be
much greater than would ever be transported on the water it
obstructs. ⊤ is for the municipal power to weigh the con-
siderations which belong to the subject, and to decide which
shall be preferred, and how far either shall be made subser-
vient to the other."

We have indulged in these reflections on a kindred subject,
to show that the new methods of travel and transportation,
introduced by modern discovery, have somewhat modified
the ancient rules which gave redress for private injuries,
caused by public nuisances; or, rather, the right of the gov-
ernment to exercise its police power, in selecting and foster-
ing one public enterprise, looking to the public accommoda-
tion, at the expense of other interests, private and public,
has been more clearly declared and defined. Inventions
new and useful, and new industries and new enterprises con-
sequent thereon, necessarily impose the duty of making new
applications of legal principles. The world, in its industries
and commerce, is making giant strides; and judicial science
must struggle to keep pace with the necessities which are
the fruits of such wonderful progress.

Highways and streets are necessities in every civilized
community. Their proper maintenance and preservation
fall evidently within the purview of police power. Mr. Coo-
ley says (Const. Lim. 588), "The highways, within and
through a State, are constructed by the State itself, which
has full power to provide all proper regulations of police to
govern the action of persons using them, and to make, from
time to time, such alterations in these ways as the proper
authorities shall deem proper."

In Dillon on Corporations it is said: "§ 518. Public streets, squares, and commons, unless there be some special restriction when dedicated or acquired, are for the *public* use; and the use is none the less for the *public at large*, as distinguished from the municipality, because they are situate within the limits of the latter, and because the legislature may have given the supervision and control of them to the local authorities. The legislature of the State represents the public at large, and has full and paramount authority over all public ways and public places. 'To the commonwealth here,' says Chief Justice GIBSON, 'as to the king in England, belongs the franchise of every highway, as a trustee for the public; and streets, regulated and repaired by the authority of a municipal corporation, are as much highways as are rivers, railroads, canals, or public roads, laid out by the authority of the quarter sessions.'

"§ 519. By virtue of its authority over public ways, the legislature may authorize acts to be done upon them, or legalize obstructions therein, which would otherwise be deemed nuisances. As familiar instances of this, may be mentioned the authority to railway, water, telegraph, and gas companies, to use or occupy streets and highways for their respective purposes. And it may be here observed, that whatever the legislature may authorize to be done, is of course lawful; and of such acts, done pursuant to authority given, it can not be predicated that they are nuisances; if they were such without, they cease to be nuisances when having the sanction of, a valid statute."

In *Black v. Phila. & Reading R. R.*, 58 Penn. St. 252, the court said : "The ground on which the plaintiffs found their application is, that this track crosses William, Bath, and Bank streets, at grade, and is a public nuisance, from which the plaintiffs suffer special damage, not shared by their fellow citizens. The track complained of is in certain public streets, and not upon any property of the plaintiffs, and, if a nuisance, is a public one, which could be the subject of a public prosecution, which the commonwealth have not deemed proper to institute. The plaintiffs are, therefore, bound to make out two things : 1st, that this is a public nuisance; and, 2d, that the plaintiffs have sustained special damage, which if they do not prove, renders the first question immaterial."

In *Commonwealth v. Erie & North East R. R.*, 27 Penn St. 354, the same court said, "The right of the supreme legislative power to authorize the building of a railroad on a street, or other public highway, is not now to be doubted."

In the *People v. Kerr*, 27 N. Y. 188, speaking of the streets

of New York city, the court said: "So far as the existing public rights in these streets are concerned, such as the right of passage and travel over them as common highways, a little reflection will show that the legislature has supreme control over them. When no private interests are involved, or invaded, the legislature may close a highway, and relinquish altogether its use by the public; or it may regulate such use, or restrict it to peculiar vehicles, or to the use of particular motive power. It may change one kind of public use into another, so long as the property continues to be devoted to public use. What belongs to the public may be controlled and disposed of, in any way which the public agents see fit. The numerous statutes by which railroad companies are authorized to use and occupy public highways, have not yet been questioned; and I do not see how they can be, on behalf of the people, or for any reason except when they are shown to interfere with private rights in the soil over which the highway passes. As long as the use to which a highway, or any other public property or right, is to be applied or transferred, is a public use, it is a matter of discretion in the legislature to permit its application or transfer, and the people must question their action elsewhere than in the courts.

"If the use of the streets in question in this action, for the purposes contemplated by this act, is a public use, the grantees of the right to apply them to this use are not to be required, as a condition to such use, to make compensation to the owners of any property affected by their proceedings, for the consequential damage which may follow to the latter, however great and however inevitable it may be. Even though the construction and use of an iron track for vehicles, in the streets of the city of New York, should be an interference with and injury to the use and enjoyment of the lots fronting on such streets, to such an extent that it would be a continuous private nuisance, if it were not authorized by law; yet the statute granting such authority is not unconstitutional or invalid, because it does not require compensation for this injury to the owners of such property. Private rights and interests must and do give way, in numerous instances, to the demands of the public good."

In the *City of Clinton v. The Cedar Rapids & Missouri River R. R. Co.*, 24 Iowa, 455, it is said: "Where the fee of the streets in a city is vested in the corporation, in trust for the public, the legislature may authorize them to be used by a railroad company in the construction of its road, with the consent of the city, and without compensation."

In *Murphy v. City of Chicago*, 29 Ill. 279, it is held: "A city is not liable for damages, resulting from the proper exer-

[Perry v. New Orleans, Mobile & Chattanooga Railroad Company.]

cise of authority in permitting railroad tracks to be laid in
the streets, or in raising the grade of streets. Unless the
authorities of a city exceed their power in this regard, there
is no liability."

In *Moses et al. v. Pittsburg, Fort Wayne & Chicago R. R.
Co.*, 21 Ill. 517, it is said : " When, by a city charter, its local
authorities are vested with exclusive control over the streets,
as in the city of Chicago, and those authorities grant per-
mission to locate railway tracks along a street, the owners or
occupants of property fronting on such street cannot enjoin
the laying of such tracks, nor receive any damage or com-
pensation for such use of a street."

In *Porter v. North Missouri R. R. Co.*, 33 Mo. 128, it is
said : " The use by a railroad, under authority of its charter,
of a street in its ordinary use as a means of travel and trans-
portation, is not a perversion of the highway from its origi-
nal purposes. Any damage to the property abutting on the
street, resulting from such obstruction, is *damnum absque in-
juria.*"

In *Vason v. South Carolina R. R. Co.*, 42 Ga. 631, it is said :
" The use of steam engines, to draw trains of cars over the
street railroad, laid down by the Augusta & Summerville R.
R. Co., through Washington street, in the city of Augusta, is
expressly authorized by acts of the legislature of this State,
and by the contracts and ordinances of the city of Augusta ;
and being so authorized, the running of said trains cannot
be abated as a public nuisance, under the Revised Code of
this State, even though such use tend to the immediate an-
noyance of the citizens in general."

In *Tennessee & Alabama R. R. Co. v. Adams*, 3 Head, 596,
it is said : " The legislature has the power to authorize the
building of a railroad within a town or city, or upon a street,
or other public highway."

The same principle, with slight modification, is declared in
*Inhabitants of Springfield v. Conn. R. R. Co.*, 4 Cush. 63 ;
*James River & Kanawha Co. v. Anderson*, 12 Leigh, 278 ;
*Tate v. Ohio & Mississippi R. R. Co.*, 7 Ind. 479 ; *New Albany
& Salem R. R. Co. v. O'Daily*, 13 Ind. 353 ; *N. O. & Carrol-
ton R. R. Co. v. Second Municipality of N. O.*, 1 La. An. 125 ;
*Geiger v. Filor*, 8 Fla. 325 ; *The State v. Mayor*, 5 Porter,
279.

In *Peters v. N. O., Mobile & Chattanooga Railroad*, at the
present term, we announced, that the entire question we have
been considering above must be and is confined to legisla-
tive discretion. We said : " It is a part of the sovereignty,
to be exercised or withheld for the public welfare. What
will best promote the interests of the public, must, in a great

degree, be left to the wisdom and discretion of the legislature. When it is exercised, one right or privilege of the public is taken away, or impaired, that another, considered of greater value, may be conferred and fostered."

Time, the unerring test in the utilization of new discoveries, has demonstrated that long and connecting lines of railroad greatly facilitate and cheapen transportation. To construct and operate such long and connecting lines, it is necessary that cities, towns, and navigable watercourses shall be traversed by them. The city is traversed, necessarily, by and through its streets ; and in laying a railroad track along a public street, the use and comfort of the latter, as a highway or thoroughfare, must necessarily be somewhat impaired. When this is done under proper authority, it is but the assertion of so much of the sovereign power and discretion, by which one right or easement is abridged in its enjoyment, that the public may have another, deemed to be of greater value.

The rights of property in the public streets of a city are of two classes. One of the classes embraces all those cases where, by a simple act of dedication, without any conveyance of title, the owner of the freehold sets off a part of the land as a public highway. When this is the case, neither the government, the municipality, nor the public, acquires any other interest than that of a mere easement. The ultimate fee remains unaffected by such dedication. When a street, thus dedicated, is improperly obstructed, or perverted to a use other than that for which it was dedicated, the owner of the fee has left in him sufficient title or right to prevent or redress the wrong ; and for this purpose, the general rule is, that the owner of the attingent property is the owner of the ultimate fee, extending to the centre of the street.—See *Cincinnati v. White*, 6 Peters, 431 ; Dillon on Corp. §§ 493, 495, 496, 500, 524.

" When, however, the fee, or original title, passes from the original proprietor, as in some of the States it is declared it shall in statutory dedications, and in land acquired for streets and public purposes, by the exercise of the right of eminent domain, such proprietor, or the adjoining owner, cannot maintain an action for injuries to the soil, or ejectment; but he still has his remedy for any special injury to his rights by unauthorized acts of others."—Dillon on Corp. § 525.

But, in each of these classes of cases, if the sovereign power grant the right to construct a railroad track and run trains on or over such public street, this is a legitimate exercise of the police power inherent in the State, and the

[Perry v. New Orleans, Mobile & Chattanooga Railroad Company.]

changed use of the street ceases to be a public nuisance of which any one can complain.—See an able discussion of this subject in *Barney v. City of Keokuk*, Sup. Ct. U. S., 4 Otto, 324. When, however, under the first named of the above classes, the ultimate fee remains in the land proprietor, the municipal government cannot confer on a railroad corporation the right to convert a public street into a road-bed for its own use, unless the charter of such municipality, or some other legislative authority, confer on it the power to do so. Such police power can only be exercised by the sovereignty, or under its authority. We say nothing, at present, of the right of the railroad corporation, under the doctrine of eminent domain, to have a street condemned to its use, making compensation.—See *James River & K. Co. v. Anderson*, 12 Leigh, 278 ; *Inhabitants of Springfield v. Conn. River R. R. Co.*, 4 Cush. 63 ; *Tate v. Ohio & Miss. R. R. Co.*, 7 Ind. 479.

The bill in the present case was filed in favor of certain persons, alleged to be the owners of property bordering on Commerce street, in the city of Mobile, and seeks to enjoin the laying of the track of defendant's railroad along said street, between Church street, on the south, and Beauregard street, north. The bill alleges facts, tending to show that the use of the street as a thoroughfare will be much obstructed by the presence of the railroad and its trains ; that Commerce street, between the named points, is the most important commercial street in the city ; that the rents of stores on the street will suffer shrinkage by the construction and use of the railroad ; and that such public nuisance will work a private injury to the complainants. Many facts are averred, tending to show these probable results. Among the statements of the bill are the following :

" That Commerce street is an old street, opened more than thirty years ago, by the owners of lands over and through which it passes, for their own convenience ; and was by them permitted to be used by other citizens and travellers, as a public highway, and has ever since continued, and now is such public street or thoroughfare ; and that said complainants, and all other owners of lands fronting on said street, own the lands in front of their buildings, to the centre of said street, subject only to the public easement, or right of way over it, acquired as before stated : and the city has never been the owner of the fee, or soil, of any part of said street. *    *    *    *    *    *    *    *    *

"Complainants further show, that said railroad company have made no application to them, or to the other owners of the property on said street, for permission or authority to use the same for their said road, but are proceeding, as com-

plainants are informed, under a pretended ordinance of the corporate authorities of the city of Mobile, adopted," &c. The bill charges the procurement of an ordinance of the city, granting to the railroad "a perpetual franchise and monopoly in a public street, for the exclusive use and private interest of the corporation, to the great damage and injury of complainants, and all other owners on and in said street, and without making to them any compensation therefor."

A copy of the city ordinance is attached to the bill as an exhibit, which does grant the power to construct the railroad on and along Commerce Street.

It will be seen from the averments of the bill, given above, if the facts be truly stated, Commerce street was established by dedication, and that it belongs to the class of which the ultimate fee resides in the co-terminous land proprietors. We have looked into the act "To incorporate the city of Mobile," approved February 2, 1866—Pamph. Acts, 202. Sections 1, 30 and 94 bear on the question of the powers of the municipal government. We find no express provision in the charter, authorizing the city authorities to grant to the railroad company the right to lay the track of its road on the streets of Mobile. We have shown, above, that such power can not be exercised by the city government, unless it is conferred upon it by the legislature. The present case was finally tried on demurrer to the bill, which is an admission of the truth of every averment that is well pleaded. We have thus presented to us a *prima facie* case of public nuisance, attempted to be erected in a street, the fee of which is in private individuals, who complain and show that such structure will do them an individual injury; and the authority shown for such structure is an ordinance of the city, which its authorities had no power to enact. The demurrer to the bill should not have been sustained, but the defendant should have been put to its defense. If, as supposed by the chancellor, the property of Commerce street was in the city, or out of the landed proprietors, then the city ordinance was ample authority.

·2. We have been asked to look at the act "To incorporate the New Orleans, Mobile & Chattanooga Railroad Company," approved November 24, 1866—Pamph. Acts, 6. If that act, section 13, were before us, it would seem to meet the wants of this case, no matter what the class to which Commerce street belongs. But we can not consider that statute. It is a private law, and must be proved in any court; while, in the Chancery Court, it is required to be pleaded as well as proved. 1 Greenl. Ev. § 480; *McDonald v. Mobile Life Ins. Co.*, at this term.

Our attention has been directed to the case of *Fredericks-burg & Potomac R. R. Co. v. City of Richmond*, recently decided in the Supreme Court of Appeals of Virginia. The opinion of CHRISTIAN, J., delivered in that case, contains much sound argument, and many reasons why legislative bodies, in conferring on railroad corporations right of way over streets of cities and towns, should reserve to such cities or towns some control and discretion in the selection of the street along which the railroad will be permitted to lay its track. In that case, the legislative grant authorized the raising of "a joint capital stock, for the purpose of making a railroad from some point within the corporation of Richmond, to be approved by the common council, to some point within the corporation of Fredericksburg," &c. It is manifest that, in this grant of power, no absolute authority was conferred on the railroad corporation to locate its track on any street, without the approval of the common council.

Section 13 of the act incorporating the New Orleans, Mobile & Chattanooga Railroad Company contains no such limitation on the power of the corporation; and while it may be a subject of regret that no such wholesome restraint has been reserved in the present charter, we have no power to insert one by construction. Under the rules declared above, this entire subject was within the power and discretion of the legislature, and they seem to have conferred the right in absolute terms. The principles declared in the Virginia Supreme Court of Appeals are not in conflict with our views expressed above.

A supplemental bill was filed, which alleges that the city ordinance, authorizing the railroad company to lay its track in Commerce street, was subsequently repealed. We forbear to comment on this, because the question will become a very different one, when the act incorporating the New Orleans, Mobile & Chattanooga Railroad Company, set up in the answer, is brought before the court. On the question of the effect of such repeal, if done after work had been commenced under it, even if the city ordinance had been necessary to confer the right in the first instance, see *Fearn's Ex'r v. Mayor, &c., Mobile*, at the present term. See, also, section 13 of the railroad charter, *supra*.

3. We do not think the charge of bribery in this record is sufficiently specific to require any notice at our hands. It omits to charge the officer bribed, the sums paid or promised, &c. Pleading should, at least, tender an issue, which can be met by a denial, and by testimony directed to an inquiry that is definite and intelligible.

While we feel bound to reverse the decree of the chancel-

lor, by which he sustained the defendant's demurrer, we think the answer justified the dissolution of the injunction. We therefore decline to reinstate it.

Reversed and remanded.