# Southern Bell Telephone Co. v. Francis.

# Same v. Allen.

### *Actions of Trespass.*

1. *Right of owner of abutting property in city street.*—The owner of property abutting on a public street in a city, in the absence of statutory provisions to the contrary at the time of the dedication, or of a different intention appearing from the instrument or act of dedication, owns the fee in the land to the center of such street, subject to the public easement.

2. *Same; ownership of trees in street, qualified and limited.*—An abutting proprietor's ownership of the trees in a city street, whether they were planted by him, or acquired by devolution of title to the adjacent property, is a qualified and limited ownership, subordinate to

the public right to safe and convenient passage, and to the rights, powers, and duties of the governing municipal body in the protection, promotion and establishing of every public use in and upon the streets in a city.

3 *Same; location of telephone line in street; when not a trespass.*—Even if the posts and wires comprising a telegraph and telephone service are an additional burden on the street, for which compensation must be made to the owner of the abutting property, yet concurrent legislative and municipal authority granted to a telephone company to erect its poles and suspend its wires in and over the streets of a city will protect it from being treated as a trespasser, if its works are so constructed as not to obstruct or interfere with the use of the streets by the public or the property owner's right of ingress and egress to and from the abutting property.

4. *Injury to trees in street, by telephone company; when not a trespass.* A city ordinance requiring the removal of telegraph and telephone poles from that part of the street used by vehicles, and that they be placed on the sidewalk within 6 or 12 inches of the curb, is not an unreasonable or unlawful regulation, but a prudent, if not necessary, requirement for a populous city, and in its enforcement, if it becomes necessary for a telephone company, acting under the authority of and in obedience to the ordinance, to trim or remove the trees in front of an abutting owner's property, it cannot be regarded as a trespasser, or liable as such to the abutting owner.

APPEALS from the City Court of Birmingham.
Tried before the Hon. WM. W. WILKERSON.

HEWITT, WALKER & PORTER, for appellant.—(Their brief did not come to the hands of the reporter.)

TALIAFERRO & HOUGHTON, for appellee Francis. ALTMAN & McQUEEN, for appellees Allen *et al.*—(1.) The ultimate fee, to the center of the street, was vested in the abutting owner.—*Evans v. Savannah & W. R'y Co.* 90 Ala. 54; *Columbus & W. R. Co. v. Witherow*, 82 Ala. 190; *Moore v. Johnson*, 87 Ala. 220; *Perry v. N. O. & M. R. Co.*, 55 Ala. 413; *Rich v. Minneopolis*, 37 Minn. 423; 5 Am. & Eng. Encyc. of Law, 405. (2.) The abutting owner may maintain trespass or ejectment against one unlawfully occupying the street.—*Terre Haute R. Co. v. Rodel*, 67 Ind. 128; s. c., 46 Am. Rep. 164; *City of Delphi v. Evans*, 36 Ind. 90; *People v. Foss*, 20 Am. St. Rep. 532; Code, § 3876; *Clark v. Dasso*, 34 Mich. 85; *Phifer v. Cox*, 21 Ohio St., 248. (3.) Appellees' right to to the trees and every part of them was as clear and

well defined as their right to access to their lots or lateral support to their land, and it has been decided that a city could not cut down its streets, even for the purpose of grading them, so as to deprive an a adjacent owner of reasonable access to his lot.—*Montgomery v. Townsend*, 80 Ala. 489; *Montgomery v. Maddox*, 89 Ala. 181. See also *C. & W. R. Co. v. Witherow*, 82 Ala. 190; *Clark v. Zeigler*, 79 Ala. 346; *Perdue v. Brooks*, 85 Ala. 459.

THORINGTON, J.—These two cases arise from substantially the same state of facts, and were submitted together in this court. Appellees, being owners of property abutting on a public street in the city of Birmingham, brought suit in trespass against appellant to recover damages for injury to their property resulting from the act of appellant's agents or servants in cutting and trimming certain trees growing on the sidewalk in front of appellees' lots, which in one case had been planted by appellee some years ago, and in the other case it does not appear by whom they were planted. Appellant, a corporation invested with the right of eminent domain under the laws of this State, and authorized by law to erect poles and stretch wires thereon through the streets of Birmingham, was required by an ordinance of that city to remove certain of its poles and wires from the street on which appellees' property is situated, and to place them on the sidewalk in front of such property. Appellant claims that, in order to comply with this ordinance, it became necessary to cut and remove many of the limbs of the trees which had entwined themselves about the wires, and also to cut other limbs in order that the trees should not interfere with the wires after the poles were removed to the sidewalk and the wires suspended over the tops of the trees; that, on ascertaining this to be necessary, it so informed the mayor of the city, who promised to obtain the consent of the property owners; that afterwards, and without having obtained such consent, as appellees were informed at the time, the mayor sent an officer of the city fire department to superintend the trimming of the trees, and under his direction the work was done by appellant's employés. Besides the appellant's wires on the poles, there was also a fire-alarm telegraph wire, which was the property of the city, and

used in connection with the fire department  It was also removed with the poles and appellant's wires.  Its position on the poles was underneath appellant's wires, and the testimony tends to show it was this wire mainly that necessitated the cutting of the trees.  The cases were tried before a judge of the City Court, without a jury, and judgments were rendered in both cases for appellees, who were plaintiffs in the court below.  The measure of damages adopted by the City Court was the difference between the market value of the lots abutting on the street before the trees were mutilated by the alleged reckless cutting and their value after such cutting.  The appeal is taken pursuant to the statute creating said court, and brings the whole case before us for review.

The two controlling question are :  First, Whether an action of trespass lies in favor of appellees, as owners of the lots abutting on the street where the trees are standing, against appellant for the acts of its employés in cutting the trees.  Second, If such liability was incurred, what is the measure of damages?

Appellant's counsel have filed an interesting and elaborate argument in support of the proposition that a telephone service does not constitute an additional burden on the public streets of a city, and they cite numerous cases which are ably reasoned ; but, in our opinion, the decision of the cases presented by these appeals for our consideration does not turn on that question, and we therefore leave it undecided,  Other principles to which we will presently advert must govern our conclusions.

The owner of property abutting on a public street in a city, in the absence of statutory provisions to the contrary at the time of the dedication, or of a different intention appearing from the instrument or act of dedication, owns the fee in the land to the center of such street subject to the public easement.— *Western Ry. Co. v. Alabama Grand Trunk Ry. Co.*, 96 Ala. 272; *Evans v. Savannah & Western Ry. Co.*, 90 Ala. 54; *Moore v. Johnston*, 87 Ala. 220; *Columbus & Western Railway Co. v. Witherow*, 82 Ala. 190, 3 South. 23; *Perry v. New Orleans, N. & C. R. Co.*, 55 Ala. 413; 5 Am. & Eng. Enc. Law, 405.  And, in absence of proof to the contrary, the presumption of law is that the fee to the center of the street is in the owner of the abutting property.—*Rice v. County*

*of Worcester*, 11 Gray, 283 ; *Railway Co. v. Rodel*, 46 Am. Rep. 164; *Weller v. McCormick*, (N. Y. Sup.) 1 Atl. 516 ; *City of Boston v. Richardson*, 13 Allen 146. When such ownership is of the ultimate fee in land constituting a public county road, it has generally been recognized as retaining with it, subject to the easement of passage and its incidents, and for purposes of repairs, the right to the earth, timber and grass growing between the center line of the road and the boundary of the owners' land along the road, as well as all minerals, quarries, and springs below the surface ; and such owner may maintain actions against those who interfere with these rights. But, in respect of streets in populous places, it has been said, and we think with obvious reason, that the public convenience requires more than the mere right to pass over and upon them, and that the uses to which they may be legitimately put are greater and more numerous than those which may be applied to ordinary roads or highways in the country. Mr. Dillon, in his work on Municipal Corporations, in speaking of municipal control over public streets, uses the following language : "Whether the municipal corporation holds the fee of the street or not, the true doctrine is that the municipal authorities may, under the usual powers given them, do all acts appropriate or incidental to the beneficial use of the street by the public, of which, when not done in an improper and negligent manner, the adjoining freeholder can not complain." In this State, however, that doctrine must be accepted as limited and controlled by the constitutional provision requiring municipal and other corporations invested with the right of eminent domain to make just compensation for property taken, injured, or destroyed by the construction or enlargement of its works, highways, or improvements. Const. Ala. Art. 14, § 7 ; *City Council of Montgomery v. Townsend*, 80 Ala 489; *Id.*, 84 Ala. 478 ; *City Council of Montgomery v. Maddox*, 89 Ala. 181. Although it should be conceded that the posts and wires comprising a telegraph and telephone are an additional burden on the street, for which compensation must be made to the owner of the abutting property, the city, if it have legislative authority for that purpose, may grant the right to such a company to use the public streets for its business in common with, and without obstructing, the use

of such street by the public.   Concurrent legislative and municipal authority granted to such a company to erect its poles and suspend its wires in and over the streets of a city will protect it from being treated as a trespasser, and its works from being declared a nuisance, if its works are so constructed as not to obstruct or interfere with the use of the streets by the public or the property owners' right of ingress or egress to and from his abutting property.—*Perry v. New Orleans, M. & C Railroad Co.*, 55 Ala. 413.   If the company, under such circumstances, is not a trespasser in its occupancy of the street, it is competent for the city to exercise whatever legislative authority it may possess in the matter of regulation and control over the streets, in order to render effective the right conferred on the company to plant its poles and suspend its wires in and over the public highway ; and it therefore becomes necessary to consider the nature of the property owners' claim to the trees, and the extent of the city's authority in respect thereto, in the exercise of the powers and duties imposed on it to maintain safe and convenient highways throughout the entire width thereof.—*City Council v. Wright*, 72 Ala. 411.

Appellees' ownership of the trees, whether the latter were planted by them on the sidewalk, or acquired by devolution of title to the adjacent property, was and is a qualified and limited ownership, subordinate to the public right to safe and convenient passage, and to the rights, powers, and duties of the governing municipal body in the protection, promotion, and establishing of every public use in and upon the streets in a city.—*Baker v. Town of Normal*, 81 Ill. 108.   In respect of all such matters, the private right of the owner of the abutting property to maintain the trees must yield to the paramount public right whenever the necessity may arise, although, until such necessity does arise, the owner is clearly entitled to the enjoyment of all the benefits which may result to his property from such trees, and to protection from their distruction or mutilation by others. For instance, if the roots of the trees should cause irregularities or breaks in the pavement upon the sidewalk or street, or if the shade and moisture from the trees should rot or injure a wooden pavement, or if the trees otherwise interfered with vehicles or foot passengers, it would, in our opinion, be clearly within the power and

duty of ⅜ the city to remove such trees, and without liability to the owner. In principle, we can perceive no substantial difference between the exercise of that right by the city in the cases above suggested and where the removal of the trees may become necessary in locating upon a street a public work authorized by law to be placed upon the street, and especially where such public work is .employed by the city in so important and vital a matter as the support of wires used by the city in connection with its fire department. The location of telegraph and fire alarm wires and poles upon the street is, in the nature of the case, necessarily within the sound discretion of the municipal governing body, who hold the streets in trust for the use of the public, and who are bound in law to so maintain them as to provide safe and convenient passage to vehicles and pedestrians. It may be said to be matter of common knowledge, as well as the result of experience in such governing bodies, that the appropriate location for such poles is near and inside the sidewalk curb, where they interfere with neither pedestrians passing along the sidewalk, nor with vehicles travelling along the roadway, and where falling or trailing wires can do the least injury. The city ordinance, therefore, shown by the record, requiring the removal of telegraph and telephone poles from that part of the street used by vehicles, and to be placed on the sidewalk within 6 or 12 inches of the curb, was not an unreasonable or unlawful regulation, but a prudent, if not necessary, requirement for a populous city, and in its enforcement, if it became necessary to trim or remove the trees in front of appellees' property, neither the city, nor appellant, acting under the authority of and in obedience to the ordinance, can be regarded as trespassers. Horr & B. Mun. Ord. § 229; 2 Dill. Mun. Corp. § 688; *Bills v, Belknap*, 36 Iowa, 583; *Weller v. McCormick,* (N. Y. Sup.) 1 Atl., 516.

It is not to be inferred, however, from anything that has been said, that either the city, acting under its police power, or any corporation invested with the right of eminent domain, acting under the city's authority, is absolved from all liability to the owner in such cases; for, if the city or other corporation invested with the right of eminent domain, acting under municipal authority, proceeds to cut or trim trees planted on a side-

walk by the owner of abutting property under lawful authority, when no necessity for such cutting exists, or when the cutting clearly exceeds the necessity, and consequential injury results therefrom to such abutting property, the owner will have his appropriate remedy at law to redress the injury.—*Bills v. Belknap, supra*; *City Council of Montgomery, v. Townsend*, 84 Ala. 478. But the remedy for such injury, as we have shown, is not in trespass, but for the consequential damages resulting to the adjacent property; and the liability exists by reason of the constitutional provision hereinabove quoted, which invests the owner not only with the right to damages for property taken, but also where his property is injured or destroyed under such circumstances. The injury to the abutting property of appellees in both cases is shown by the proof not to be the direct and immediate result of the cutting of the trees on the sidewalk, but indirect and consequential, and, furthermore, that appellees, in cutting the trees, were proceeding under lawful authority. If there is any liability, it is in case, not trespass. Both suits are in trespass, and it results that the city court erred in its judgment in each case. Both judgments are reversed, and, inasmuch as it appears that neither action can be maintained in the form in which it is brought, judgment for appellant will be here rendered in each case.

It is unnecessary to consider on these appeals the question as to the measure of damages, and we will not anticipate it. Reversed and rendered.

The foregoing opinion was delivered November 3, 1892. The appellees applied for a rehearing, which was granted, and the cases were again argued and submitted. Oh February 4, 1896, the following opinion was delivered :

HEAD, J.—The defendant lawfully put its servants to removing telephone wires in a street in the city. The service, necessarily and lawfully, required the cutting of some of the branches of certain shade trees in the street, in front of plaintiffs' lots, growing upon those parts of the street of which plaintiffs were, respectively, seized in fee. The servants, to state the case most strongly for the plaintiffs, whilst performing the defendant's service, went beyond their

duty and authority, and willfully cut the trees, beyond any necessity to the proper removal of the wires, doing unnecessary damage to the plaintiffs' property. The only question to be considered is whether the defendant is liable in actions of trespass.

We believe it to be an undeniable proposition that a person cannot be a trespasser *vi et armis* who neither commits, authorizes, aids or abets, nor subsequently ratifies, the wrongful act. It is observable, under this rule, that if one expressly commands another to do the wrongful act, and the same is done in pursuance of the command, he is, under familiar principles, guilty as a principal, and liable as such. Nor is it essential to liability in trespass that there be an express command to do the wrongful act. Thus, if an agent or servant, in and about the business of the principal or master, commits a trespass upon the person or property of another, in the immediate presence of the principal or master, it will be presumed that it was done by the direction of the latter, who will be liable for the trespass, unless it is affirmatively shown that he did not coerce or direct the act, but did what he lawfully should to prevent it. *Foster v. Essex Bank*, 17 Mass. 479, s. c., 9 Am. Dec. 168. So, also, if a principal or master direct his agent or servant to do an act which is, in itself, unlawful, and, in its commission, an injury is done to another; or if the act commanded, if done without injury to another, is, in itself, not unlawful, yet is of such a nature that the natural and probable effect or result of its performance is injury to another, and, in its performance such injury is done, he who gave the command, in either case, is a trespasser. Thus, in *Gregory v. Piper*, 9 B. & C. 591, a master ordered his servant to lay down a quantity of rubbish near his neighbor's wall, but so that it might not touch the same. The servant laid the rubbish, and exercised due care in doing so, yet such was the character of the act that some of the rubbish naturally ran against the wall. *Held*, that the master was liable in trespass. When the wrong done has benefitted another, or was done for that purpose and in his interest, such other, with full knowledge of the facts, may make himself a trespasser by ratification. Lord Coke stated this rule thus : "He that agreeth to a trespass after it is done is no trespasser unless the trespass was done to his use

or for his benefit, and then his agreement subsequent amounteth to a commandment." 4 Inst. 317; Cooley on Torts, 127.

To the general rule of non-liability in trespass above announced and explained, we are aware of but one exception, which is that, on principles of public policy, a public officer is liable in that form of action for the trespasses of his deputy, committed *colore officii* whether, under the rules above stated, he would be liable as principal or not. 1 Chit. Pl. Marg. p. 82. In an early Massachusetts case, it was held that a sheriff, who was not present at the service of a writ, when his deputy committed a trespass, was not jointly liable with the deputy. *Campbell v. Phelps*, 1 Pick. 62. But the better rule seems to be that the officer is always constructively present, and jointly responsible for the torts of his deputy committed *colore officii*. See the cases collated in note to *Kirkwood v. Miller*, 73 Am. Dec. 134, 141; Cooley on Torts, pp. 132, 135; 1 Chitty Pl. Marg. p. 82.

Since the decision by Lord Kenyon, in the year 1800, in the leading case of *McManus v. Crickett*, 1 East, 106, until a comparatively recent period, the rule of non-liability of the master for the willful act of the servant, there laid down, was carried to the extent of securing immunity to the master from all liability to compensate the injury, in any form of action. As late as the case of *Cox v. Keahy*, 36 Ala. 340, decided in 1860, the late Chief Justice Stone, delivering the opinion of the court, vigorously maintained and applied the doctrine of *McManus v. Crickett*. It was an action on the case, for negligence of the defendant's servants in operating a steamboat. There was some evidence tending to show that the injury was willfully committed by the servants whilst operating the boat. The trial court was requested to instruct the jury that the defendants were not liable if the collision was willfully caused by the acts of their agents or servants. The instruction was refused, and the ruling was held error, for which the judgment was reversed. After noticing some other cases, the court remarked: "None of them materially unsettle the great distinction ruled in *McManus v. Crickett*, *supra*, between those injuries which are the direct result of intentional or willful fault on the part of the servant, and

those which result from his mere carelessness or want of
skill   It seems to be well settled, that if the servant be
in the performance of a duty entrusted to him, and,
from a want of either skill or diligence, injure another,
it will not excuse the master or employer, even if the
servant, in the matter complained of, was acting contrary
to insructions.   Trusting   the servant   in the given
case is an   assumption   by the master   of all   respon-
sibility   which   results   from   negligence   or   want
of skill in   the servant.   But   this   rule   does   not
apply   when   the   servant   actually   wills   and
intends the injury, or steps aside from the purpose of
the agency committed to him, and inflicts an independ-
ent wrong.''   The learned judge concluded his opinion
with this remark:   "Whether some of the principles
ruled in the case of *McManus v. Crickett, supra*, should
not be changed so as to accommodate the relation of
master and servant to the very useful, yet terrible mo-
tive agent, steam, is a question not for us, but for the
legislature.''   But, as is well known, the doctrine of
that case has been changed, and that without legisla-
tion.   Now, it must be accepted that, in promulgating
this change, the court did not intend to usurp the func-
tions of the law-maker, and make new law, but to correct
the errors of existing doctrines.   The change was made
upon a principle ; and what is that principle?   As we
have seen, and as every lawyer knows, it has ever been
the rule   that   the master is liable   in damages resulting
from the   negligence or   want of skill of the servant, in
the performance of the master's service,   This is so, not
because the master has himself committed a wrong, but
upon the well recognized principle that in employing a
servant to perform a particular duty, he guarantees to
the public at large, excepting fellow servants engaged
in the common employment, that the servant, so em-
ployed, possesses ordinary skill and carefulness, render-
ing him fit for the work he is appointed to do ; and that
he, the servant, will characterize the performance of his
duties by bringing to bear upon it the exercise of that
degree of skill and carefulness.   If the servant does not
possess these qualifications, or possessing, fails to exer-
cise them, in a given case, with resultant injury to an-
other, the master is responsible, as a consequence of the
servant's wrong, for failing to make good that which he

has assumed, for the servant, to the general public. The change of doctrine to which we have referred, effected, as we have said, without legislation, necessarily rests upon the principle that there is no just distinction, so far as the rights of the public are concerned, between the characterization of the servant's performance of his duties, by careless or unskillful acts or omissions, and the characterization thereof by willful or intentional acts of wrong. If it be essential to the public safety that the master shall assume, for his servant, the possession and exercise of skill and diligence, for what reason is it not essential thereto that he shall assume for him the possession of that fitness of character and disposition that will deter him from using the master's service and the master's means of executing the service, placed in his hands, for the commission of willful and intentional wrong? The stupendous modern advance in industry and commerce, operated through the work and agencies of thousands of irresponsible under-servants, fraught with frightful dangers to the public safety, through the vicious disposition of so many of these servants, opened the eyes of the courts to the want, in reason and justice, of such a distinction; and the result is, that the rule of *respondeat superior* is applied to the latter, as it has ever been to the former case. But the master is thus liable, not because he, himself, has, by force and arms, directly committed the wrongful act, but because he has failed to make good, to the party injured, his assumption, for the servant, that the latter would execute the master's service in a lawful manner. His liability is, therefore, consequential upon the servants unauthorized wrongful act. As expressed by Judge Metcalf, in *Parsons v. Wenchall*, 5 Cush. 592, "the act of a servant is not the act of the master, even in legal intendment or effect, unless the master previously directs or subsequently adopts it. In other cases, he is liable for the acts of his servants, when liable at all, not as if the acts were done by himself, but because the law makes him answerable therefor." It would be repugnant to the plainest principles of law and logic to declare, that a person has *directly, vi et armis*, committed an injury when the wrongful act was done by another, without his presence, authority, knowledge or consent, or subsequent ratification.

We are not without other ample authority for our conclusion. Thus, in 1 Chitty, Pl. Marg. p. 131, we find it stated, that, "Though a master may be liable under the circumstances to compensate an immediate injury committed by his servant, in the course of his employ, with force, yet the action against the master, in general, must be case, though against the servant it might, for the same act, be trespass." And Mr. Redfield, in annotating his edition of Greenlief on Evidence, uses this language: "An action on the case is an appropriate remedy for injuries caused by the wrongful acts of the servants of defendants, even though such acts were acts of force, and such that trespass would have been the only proper remedy against the servant," citing *Havens v. Hartford R. R. Co.*, 28 Conn. 69 ; 2 Green. Ev. p. 203, note to section 226. The above quotation is in the language of the syllabus of that case, and the opinion supports it. He gives also, in a note to section 225, an extract from an English case, wherein the court remarked, "The agent's direct act or trespass is not the direct act of the master. Each blow of the whip, whether skillful and careful or not, is not the blow of the master ; it is the voluntary act of the servant." And, in annotating the 5th edition of his admirable work on Railways (Vol. 1, top p. 534), he states the principle so clearly that we cannot as well express it, as by quoting his language. He says : "It has always seemed to us that the whole class of cases, which hold that the master is not liable for the willful acts of his servant, has grown up under a misconception of the case of *McManus v. Crickett*, 1 East. 106, for they all profess to base themselves upon that case. That case, we apprehend, was never intended to decide more than that the master is not liable, in trespass, for the willful act of the servant. Lord Kenyon, C. J., in delivering his opinion in that case, with which the court concur, expressly says, speaking of actions on the case brought against the master where the servant negligently did a wrong, in the course of his employment for the master : 'The form of these actions shows that where the servant is, in point of law, a trespasser, the master is not liable, as such, though liable to make compensation for the damage consequential from his employment of an unskillful or negligent servant. The act of the master is the employment of the servant.' This reason-

ing,'' continues Judge Redfield, "certainly applies with
the same force to that class of cases where the act of the
servant is both direct and willful, as where it is only
negligent. The master is not liable in either case so
much for having impliedly authorized the act as for hav-
ing employed an unfaithful servant, who did the injury
in the course of his employment. And whether done
negligently or willfully, seems to be of no possible mo-
ment, as to the liability of the matter; the only inquiry
being whether it was done in the course of the servant's
employment. And the argument that when the servant
acts willfully, he *ipso facto* leaves the employment of the
master, and if he is driving a coach and six, or a loco-
motive and train of cars, thereby acquires a special prop-
erty in the things, and is, *pro hac vice*, the owner, and
doing his own business, may sound plausible enough,
perhaps, but we confess it seems to us unsound, al-
though quoted from so ancient a date as Rolle's Abridg-
ment, and adopted by so distinguished a judge as Lord
Kenyon. The truth is, the whole argument is only a
specious fallacy; and whether Lord Kenyon intended
really to say that no action will lie against the master in
such case, or only to say that the master is not liable in
trespass, it is very obvious the proper distinction, in re-
gard to the master's liability, cannot be made to depend
upon the question of the *intention* of the servant. The
master has nothing to do either way with the purpose
and intention of his servants. It is with their acts that
he is to be affected, and if these come within the range
of their employment, the master is liable, whether the
act be a misfeasance or a nonfeasance, an omission or
commission, carelessly or purposely done. It will hap-
pen, doubtless, that when the master is under a positive
duty to keep or carry things safely, as bailee, or to car-
ry persons safely, that while he will be liable for the
mere nonfeasance of the servant, the servant will not be
liable to the same party for such nonfeasance, there being
no privity between the servant and such party, no duty
owing to such person from the servant. But in such
case the servant will be liable for his positive wrongs and
willful acts of injury, and the master is also liable for
these latter acts, but not in trespass, ordinarily, as the
servant is, but in case. * * * * This is the view taken
of this subject by Judge Reeve, Dom. Rel. 358, 359, 360,

and it is, we think, the only consistent and rational one, and the one which must ultimately prevail.''

Judge Reeve, referring to *McManus v. Crickett* says: ''The principle adopted in the case in East shows that, when a servant does an injury with violence, the very doing of it is an abandonment of his master's service. It is said that there is a difficulty in framing a proper action to remedy the injury, if one exists; for that the injury was immediate; and, therefore, trespass *vi et armis* was the proper action, if any; and that this action proceeds upon the ground of criminality, which would subject the master to a fine. Certain it is, that the master is not liable *criminaliter*. It does not follow, because the injury by the servant was an immediate injury, that the action against the master must be trespass. It proves, indeed, if the action had been brought against the servant, it must have been trespass. * * I take it that when an immediate injury, with force, is done by another, for whom the employer is liable, the action is trespass on the case; and in perfect analogy in this case with that when a man keeps a dog accustomed to bite, and on that account is liable. It is an action of trespass on the case, although the injury is with force, and as immediate as if done by a man. I apprehend that the action on the case reported in 6 Term Rep., 125, was the proper action in which to try the liability of the master.'' In that case, the servant had committed a trespass *vi et armis* in the course of his employment..

Wood, in his work on Master and Servant, after discussing the master's liability, says: ''Thus, it will be seen that the question as to whether the master is liable in trespass or case for an injury inflicted by a servant merely affects the remedy, and not the cause of action itself, and depends upon the question whether the act is a natural, necessary or probable incident of doing the act directed. If so, the master is liable in trespass; if not, then he is not liable in trespass, but only in case.'' Wood, Mas. & Serv't, 596-7. Judge Thompson, in his excellent discussion of all these questions, both under the old and the new doctrine, and after contending, in his vigorous style, for the correctness of the new, considers, in section 10 of his observations on *McManus v. Crickett*, the question of the *proper form of action* against the master. He says: ''With respect to the form of

the action, whether trespass or case, where the old system of pleading still prevails, the following may be stated as the fair result of the cases : If the command of the master is to do a lawful act, and the servant does it an in unlawful manner, so as to injure another, then case, and not trespass, is the proper remedy." Here, when the context is considered, it is evident the author meant, by the term "unlawful manner," either a willfully unlawful, or a negligent act : for he had just declared the master liable for the willfully unlawful act of the servant. He proceeds : "But, where the act which the master commands the servant to do is unlawful in itself, and the wrong does not result merely from the manner of doing it, trespass will lie. It results that case, and not trespass, is the form of action for all injuries arising from the master's negligence or unskillfulness, not authorized or commanded by the master. To illustrate : If a railway passenger refuses to pay his fare, and the conductor, in ejecting him from the train, which he may lawfully do, puts him off while the train is in motion, or uses excessive force, whereby a cause of action accrues to the passenger, the action against the company will be case. But, if the company directs its conductors to collect illegal fares of passengers, and a passenger resists payment, for which cause the conductor puts him off the train, the action against the company will be trespass ; and the use of any excessive force beyond what was necessary to execute the unlawful order, or any carelessness on the part of the conductor, whereby the passenger is specially injured, will go in aggravation of damages." 2 Thomp. on Neg. p. 890. The learned author's illustration of negligence in the foregoing extract, it seems to us, is subject to the criticism that the acts of the conductor therein stated are acts of direct force, or trespass, and not mere negligence. The conclusion, however, that the master, in the case stated, is liable only in case, is, we think, correct. In *St. Louis, A. & C. R. R. Co. v. Dalby*, 19 Ill. 353, at p. 375, the court, after an elaborate discussion of a corporation's liability for the willful trespasses of its servants, and holding to the modern doctrine, says : "Much was said upon the argument of the hardship it would impose upon railroad companies should this action be sustained. It is supposed that it would authorize trespass

against the compay wherever it could be maintained against the servant, and that the action on the case, which is now the usual remedy, would be superseded by trespass. This apprehension is not well founded. Hereafter, as heretofore, the usual remedy for torts must be case, and not trespass. Wherever the command was to do only a lawful act, and the servant does it in an unlawful way, so as to injure another, there case would still be the proper remedy. But where the act is unlawful in and of itself, and not from the mode of doing it, trespass would lie." And the court illustrated by the case in hand, which was, where the conductor was required by the company to collect certain illegal fares, and to eject passengers refusing to pay. The court held the ejected passenger entitled to maintain trespass against the company, for the obvious reason, as we have already laid down, that the company itself commanded the commission of the trespass. Under the principle announced by the court, as above quoted, it is clear, that if the conductor had been required by the company to collect only legal fares, and eject those who refused to pay, and the conductor had willfully demanded an illegal fare, and ejected the passenger for his refusal to pay; or, in endeavoring to collect the legal fare, had willfully, or even maliciously, inflicted an unnecessary and unlawful injury upon the passenger, in ejecting him from the train, the remedy against the company would have been case, whilst, against the conductor, trespass would lie. If this be sound law, it is decisive of the question before us.

The correctness of the view we take in this opinion may be tested by a consideration of the law is in respect of liability of master and servant to a joint action. It is a familiar rule that there are no ancessories in trespass. All who are guilty at all are co-trespassers, and may be jointly sued. See note to *Kirkwood v. Miller*, 73 Am. Dec. 140, 141; Cooley on Torts, 133. Judge Thompson, in section 11 of his work, *supra*, p. 891, shows clearly that, by the weight of authority, where the liability of the master arises from an unauthorized trespass of the servant, committed in the performance of a lawful duty commanded by the master, a joint action against master and servant will not lie, for the reason that the action against the master is case, while that against the ser-

vant is trespass; and for the further reason that, the wrong proceeding directly from the servant, and not directly from the master, the latter, if compelled to pay the damages, would have an action over against the former; but he would not, at common law, be entitled to such an action where the judgment went against both as joint tort-feasors.

It is only upon the principle which we here declare that the vast array of decisions in this and other courts can possibly be maintained, where the common law of pleading prevails, which hold that, in actions on the case for negligence of the defendant's servants, the defense of contributory negligence is overcome by showing that the act of the servant, causing the injury, was willful or intentional. It is an admitted rule of pleading than an action on the case cannot be maintained if the defendant's act was a trespass only. So that, if the unauthorized willful act of the servant constitutes the master a trespasser, and suable as such, a replication to the plea of contributory negligence to an action on the case for the negligence of the servant, setting up that the servant willfully committed the act, would, manifestly, be a complete departure from the declaration. The two remedies are of such different natures that, by common law, they cannot be joined in the same action even in separate counts.—*Mobile & Montgomery Ry. Co. v. McKellar*, 59 Ala. 458. But, when we consider the master's liability as consequential, and in case, the decisions referred to are entirely reconcilable with this rule of pleading.

The cases which appear to be adverse to our conclusion are either those in states where code systems have abolished common law forms of action, or where the considerations we have adverted to were not in mind. Of the latter class is the case, in our own court, of *Louisville & Nashville R. Co. v. Dancy*, 97 Ala. 338,— an opinion delivered by the present writer.

The doctrines in respect of the relations of principal and agent, and master and servant, as applicable to the acts and contracts of corporations, are well established. It is not essential to an act or contract which binds a corporation that it be done or entered into, or authorized, by the corporate entity itself, as represented by the governing board of stockholders. It is well recognized

in the law that corporations, in carrying out corporate functions, may, and, of necessity, do, create vice-principals who, in respect of the departments of corporate business entrusted to their general control and management, partake of the corporate entity, and their acts and contracts, in execution of the functions they represent, are of the same effect and import as if done or entered into, or directly authorized, by vote of the governing board or stockholders. Thus, to illustrate: Suppose the defendant has confided to a general manager or superintendent the execution of its telephone business, in the city of Birmingham; endowed him with ample powers and means to carry on the business; to employ and discharge subordinate agents and servants, and generally to do what may be necessary to the general performance of its corporate functions in that district. Such a person, with reference to the public, is more than a mere agent acting under orders of a superior; he is *pro hac vice* a principal; he stands for, and represents, within the sphere of his authority, the corporate entity itself, and his acts are the direct acts of the corporation itself, and if, in his representative character, he commits a trespass, or commands or authorizes its commission by a servant under his orders, the corporation is suable for the wrong in the action of trespass. Many other illustrations might be given, It is thus, through agencies of this nature, that corporations may commit almost all manner of torts, such as assault and battery, malicious prosecution, libel, &c., and some classes of offenses for which they are indictable. It was never thought that a corporate vote was necessary to bind the corporations to these wrongs. As well might it be said that every contract should receive the express authority or assent of a corporate vote. But it would seem upon plain principles that a mere servant, working under the immediate control and orders of a superior, having no power or authority to do anything but perform the work he is employed and directed to do, can, in no sense, be deemed a vice-principal, for whose tortious acts, as such, the corporation is responsible. The liability of the master, as we have endeavored to show, is not for the tortious act, in such case, but in consequence of the duty he owes the public, except fellow servants, to have in his

[Tomlin v. Mayor and Aldermen of Birmingham.]

employ only servants who will perform the services in a lawful way.

It is not our purpose now to undertake to lay down any general rule to govern all cases, as to what circumstances, or extent of power conferred, are essential to constitute a vice-principal, whose acts will be directly visited upon the corporation, within the principle above declared. Each case, as it arises, will be determined eccording to its peculiar facts.

With these views, we adhere to the opinion formerly delivered in these cases by JUSTICE THORINGTON, and reverse the judgments of the City Court, and order judgment to be entered in this court in favor of the defendant, in each case.

Reversed and rendered.